Coast Wrecking Co. and others *v.* Phœnix Insurance Co., of Brooklyn.

(*Circuit Court, E. D. New York.* July 8, 1882.)

1. ADMIRALTY—MARITIME SERVICE—ADJUSTING GENERAL AVERAGE.
    Services performed by average adjusters, including expenses, disbursements, and charges incidental to ascertaining and adjusting the proportionate share chargeable to the cargo of the expense incurred in saving and discharging the cargo, and delivering it, are maritime in their nature; and an express contract for such services is a maritime contract and cognizable in the admiralty.
2. SAME—SALVAGE—WRECKING COMPANY.
    Services performed by a wrecking company in saving the cargo of a stranded vessel and transporting it in different lots to a place of safety, and there stor-

ing it, are continuous services; and every part of the cargo was interested in the whole of it, and should bear its due proportion of the whole expense of saving all that was saved.

3. SALVAGE—MEASURE OF COMPENSATION.

In estimating the compensation to be made for salvage services, not only is the service in the particular case to be regarded, but the reward is to be looked at, that it may induce aid on future occasions, by competent salvors to other property in distress; and the equipment of the Coast Wrecking Company with steamers and pumps and wrecking material and skilled men, and its readiness to act at a moment's notice, must be considered.

*George A. Black,* for libelants.
*Thomas E. Stillman,* for respondent.
In this case I find the following facts:

The libelant the Coast Wrecking Company, at the times hereinafter mentioned, was a corporation created by the State of New York, and authorized to own and hire vessels, and use them in salvage services. It had a capital of $222,000, invested in steamers and wrecking material, and a store-house, and from 33 to 35 men constantly employed, with an experienced superintendent, receiving a salary of from $4,500 to $9,000 a year, and its men and vessels were always ready to start at an instant's notice for the relief of a vessel in distress. The Phœnix Insurance Company, the respondent, was and is a corporation authorized to carry on, and carrying on, the business of marine insurance. The libelants Johnson, Higgins, and Krebs were carrying on the business of average adjusters in the city of New York, as copartners, under the firm name of Johnson & Higgins.

On the first of January, 1879, the steam-ship Vindicator sailed from Fall River, Massachusetts, with a general cargo of merchandise on board, bound to Philadelphia. On the fourth of January the Vindicator stranded on the shore of Long Island, near Moriches, and became in great danger of ultimate total destruction, with her cargo. She was stranded just inside the outer bar, heading towards the beach, with her stern to the inside of the outer bar, very low down in the water, listed to port about 45 deg., and covered completely with ice. The place where she lay was about 70 miles from the nearest harbor, and was one of the worst spots on the Long Island shore for rendering assistance. The weather was very cold, and ice formed all over the vessel. The lower hold was entirely full of water, and in the between-decks the water was as high inside as it was outside, and she was completely full at high water on the port side.

The Coast Wrecking Company, through its system of shore agents, received at New York, on the day that the vessel was stranded, notice of the fact through a telegram from its coast patrol. On the same day the company sent out from New York its steamer Relief and the schooner John Curton, with men and materials for the relief of her vessel and cargo. The Relief and the John Curton arrived along-side of the Vindicator at 3 o'clock on the morning of January 5th. W. Clyde, the owner of the Vindicator, arrived on board of her early on that morning, and conferred with her master and with the agents of the Coast Wrecking Company in regard to saving the property. A steam

pump was put at work at 6 o'clock P. M., and was kept at work through the night, and on the morning of the 6th another large steam-pump was put in, and both pumps were worked during the night of the 6th, but they had no effect in reducing the water in the vessel, and work with them was discontinued.    On the evening of the 5th the schooners S. L. Merritt and H. W. Johnson, owned or controlled by the Coast Wrecking Company, were sent to the Vindicator by that company.    On the morning of the 6th the company commenced discharging the cargo of the Vindicator into schooners.    The schooners, as fast as they were filled, were taken to a store-house on Staten Island, owned by the company, and their cargoes were there unloaded.    The crew of the Vindicator were discharged on the sixth of January.    The Coast Wrecking Company, by its representatives, employed laborers from the neighboring settlements, who assisted the officers and crews of the Relief and of the schooners in discharging the cargo. A few days after the discontinuance of the pumping the Coast Wrecking Company made an examination of the outside of the Vindicator through divers, and found nothing on the outside to show any breaks along the seams. Before the twenty-ninth of January nearly all of the cargo was out of the vessel, and in the store-house at Staten Island.    Some cargo was taken from the Vindicator on the thirtieth and thirty-first of January, and on the first and second of February.    On the eighth of February an examination of her hull, inside and out, was made by divers.    Her keel was found to be broken in several places, and her bottom to be badly injured under her boilers.    It was then determined that she could not be saved, and the Relief returned to New York with the John Curton on the ninth of February, taking with her strippings of the Vindicator, with several hundred dollars.    On the twelfth of February the Vindicator broke up and came on shore.

Among the cargo of the Vindicator were 341 bales of print goods consigned to the Eddystone Manufacturing Company: 8 cases and 8 boxes of yarn, consigned to Hall & Co.; and 12 cases and 2 boxes of hats, consigned to Lippincott, Mitchell & Co.    All of these goods were insured by the Phœnix Insurance Company, and the consignees of them abandoned them to that company shortly after the stranding of the Vindicator, and that company accepted the abandonment.    On the tenth of January, 1879, the Phœnix Insurance Company, with other owners of cargo, signed an average bond, of which the following is a copy, the part put in brackets in this copy being in writing in the original, and the rest being a printed form, there being no brackets in the original:

"Average Bond.    Whereas, the [steamer Vindicator,] whereof [Rogers is] master, having on board a cargo of merchandise, sailed from the port of [Fall River] during the month of [January inst.] bound for [Philadelphia,] and in the due prosecution of her said voyage [encountered heavy weather, and got ashore near Moriches, Long Island, where she now lies.    When news of the disaster was received at New York the Coast Wrecking Company's vessels and men were sent to the steamer, and the cargo is now being discharged and sent to New York.    The owners and agents of the steamer Vindicator are hereby authorized to settle the salvage for any sum that may be agreed upon between the salvors and underwriters in New York or Philadelphia interested, or, in the event of a suit, for such sum as may be awarded by court,] by which means certain losses and expenses have been incurred, and other

expenses hereafter may be incurred, in consequence thereof, which, according to the usage of this port, may constitute a general average, to be apportioned on the said vessel, her earnings as freight, and the cargo on board said vessel, and other charges thus incurred, may apply to and be due from specific interests. Now, we, the subscribers, owners, shippers, consignees, agents, or attorneys of certain consignees of said vessel and cargo, do hereby, for ourselves, our executors, and administrators, severally and respectively, but not jointly, or one for the other, covenant and agree to and with [Johnson & Higgins] that the loss and damage aforesaid, and other incidental expenses thereon, as shall be made to appear to be due from us, the subscribers to these presents, either as owners, shippers, consignees, agents, or attorneys of certain consignees of said vessel or cargo, shall be paid by us respectively, according to our parts or shares in the said vessel, her earnings as freight, and the said cargo, as shall belong or be consigned to us, or shall belong or be consigned to any person or persons with whom we are co-partners, agents, or attorneys, or in any manner concerned therein, provided such losses and expenses before mentioned be stated and apportioned by Henry W. Johnson, A. Foster Higgins, [and William Krebs,] average adjusters, in accordance with the established usage and laws of this state in similar cases. And we do further bind ourselves to furnish promptly, on request of said adjusters, all such information and documents as they may require from us to make said adjustment. And for the true performance of all and singular in the premises, we do hereby severally bind ourselves, our respective heirs, executors, and administrators, to the said [Johnson & Higgins] in the penal sum of [ten thousand ($10,000) dollars] lawful money of the United States. In witness whereof we have to these presents set our hands in the city of New York this [tenth] day of [January,] in the year of our Lord one thousand eight hundred and seventy-[nine.]"

. The Vindicator was a large and valuable ocean steamer built of iron. The total value of the cargo saved was $41,340.37, in its damaged condition. The total value of the strippings saved from the wreck was $718.62. There was no freight saved. The cargo saved was owned by 124 different interests. The principal interest in the saved cargo was that of the Phœnix Insurance Company. Of the 341 bales of print goods consigned to the Eddystone Manufacturing Company, and insured by the Phœnix Insurance Company, 339 were saved, of the value, as damaged, of $12,442.14. A part of the yarn insured by the Phœnix Insurance Company was saved, of the value, as damaged, of $163.36. A part of the hats insured by the Phœnix Insurance Company was saved, of the value, as damaged, of $23.80. Of the 339 bales of print goods saved, all but 51 were out of the Vindicator and in the schooners on the fifteenth of January, and were in the store at Staten Island on the 16th and 17th. On the 20th, 42 more were taken out of the Vindicator, and were in said store on the 22d, and the remaining nine bales were taken out of the Vindicator on the 26th, and were in said store before the 29th. The yarn and the hats were in said store on or before the 22d. The services of the relief extended over 37 days. She had a crew of 14 men, all told; was fitted with steam pumps; and was worth, with her outfit, about $65,000. The schooner John Curton was in service 37 days. She had a crew of six men, all told, and was worth about $3,000. She was owned by Capt. Merritt, the superintendent of the coast wrecking company, and performed hard service, being always near the Vindicator, and being used as a lighter between the Vindicator and

the other schooners. Her owner chartered her, with her crew, to the Coast Wrecking Company for $40 a day. She was not to share in the salvage. Twenty-one days of her service were prior to the twenty-sixth of January. The schooner H. W. Johnson was in service 18 days, all prior to January 23d. She had a crew of seven men, all told, and with her working equipment was worth about $12,000. She was owned by the Coast Wrecking Company. The schooner S. L. Merritt was in service 13 days, all prior to the nineteenth of January. She had a crew of six men, and a wrecking equipment, and, with her equipment, was worth about $12,000. She was owned by Captain Merritt, and he chartered her to the Coast Wrecking Company for $40 a day, and her equipment for $15 a day. She was not to share in the salvage. The Coast Wrecking Company also sent two divers from New York, to whom they paid wages ranging from $5 to $10 a day each. They sent also three foremen, two engineers, and two firemen, who were paid $5 or $6 a day each. They also sent one man in their regular employ, whose wages were $60 a month, and 10 wreckers, who were paid $2 a day each. All the other labor and assistance that were given to the Vindicator and her cargo were obtained from the neighboring settlements, and were paid for by the Coast Wrecking Company. Laborers to the number of 44 were employed on the sixth of January ; 42 on the 7th ; 37 on the 15th ; 28 on the 5th ; and 21 each on the 11th and 25th. On the 6th, 14 laborers worked all night ; on the 7th, 11 worked half of the night; on the 13th, 17 worked half of the night; and on the 19th, 4 worked all night. The wages of these men were paid by the Coast Wrecking Company, and were $2 a day with board, and $2.50 a day without board. None of these employes share in the salvage.

On the seventh of January the schooner S. L. Merritt deposited a cargo of merchandise, from the Vindicator, in the store at Staten Island. On the 8th the schooner John Curton deposited there a cargo of merchandise. On the 12th the schooner S. L. Merritt deposited there another cargo. On the 14th the schooner H. W. Johnson deposited there a cargo. From that time on a cargo was deposited there every two or three days until the twenty-second of January. The cargoes were in good order except being wet. The total expenses of the Coast Wrecking Company for the hire of the schooner John Curton, and the hire of the schooner S. L. Merritt, and for the superintendents, foremen, divers, engineers, laborers, and others employed by them at the Vindicator, and for all other charges of every kind, except the wages of the crews of the Relief and the H. W. Johnson, and the expenses of running the Relief, were $7,870.40. Of this sum $5,666 was incurred prior to the twenty-second of January, and $6,284 prior to the 26th. From the time the Relief went to the assistance of the Vindicator until all her cargo had been saved and she had gone to pieces, on February 12th, work was done night and day, when work was possible, for the preservation of the property by the Coast Wrecking Company and its employes. The labor of saving the cargo was dangerous for the men and vessels employed. The weather was stormy, and no port of refuge was near. The cargo had to be got out by divers, and this was rendered more difficult owing to the ship having settled in the sand and being hogged, which jammed everything between the decks. All of the cargo

which was saved was brought to New York and delivered to the owners, except a small part unidentified, which, with the savings of the wreck, was sold. After the Coast Wrecking Company took charge of the Vindicator, the libelants, Johnson & Higgins, were employed by her owners to render, and they did render, the necessary services at New York in corresponding with the consignees, ascertaining the valuations, and identifying the cargo, and taking general charge of the interests of all concerned. And their services in this regard, including their statement and apportionment, hereafter mentioned, in respect to the cargo delivered to the respondent, were reasonably worth the sum of $1,223.82. This does not include any commission to them for collecting and paying the salvage. On the ninth of January they issued the following circular to the shippers and consignees of the Vindicator's cargo·

"NEW YORK, January 9, 1879.

"The steamer Vindicator, from Fall River for Philadelphia, went ashore near Moriches, Long Island, where she now lies. Assistance has been sent to her, and her cargo is being discharged and sent to New York. To enable us to identify and deliver cargo we need a copy of your invoice. Will you please send it to us as soon as possible, and state where you are insured, and in what company. Any information in regard to cargo saved can be obtained from the undersigned. .                               JOHNSON & HIGGINS."

A copy of this notice, which had been sent to the Eddystone Manufacturing Company, was forwarded by it to the Phœnix Insurance Company, and was received by the latter company on the eleventh of January. Johnson & Higgins paid to the store-keeper at Staten Island $100 for receiving, identifying, and delivering the cargo. They paid to a professional appraiser $275 for appraising it. They made an elaborate statement in the form of a general average statement, in which they apportioned the charges of the coast wrecking for salvage and special disbursement, and their own disbursements· and charges, among the owners of the cargo and the wreck. Such disbursements and charges were in accordance with the established usage and laws of the state of New York in similar cases, and the losses, expenses, disbursements, and charges which they so stated and apportioned were stated and apportioned by them in accordance with the established usage and laws of the state of New York in similar cases. They have already received on account of their disbursements, charges, and services, from the owners of the Vindicator and from the owners of the cargo, about $3,000. The Coast Wrecking Company has agreed with all parties interested, except the respondent, upon a salvage of 50 per cent., and has received the sum of $14,465.16 for such salvage. The value of the property exposed to loss in rendering the salvage service was $92,000. The equipment of the Coast Wrecking Company is kept up at a large expense, and is in active service only about one-quarter of the time, and during the intervals of rest the men are fed and paid at an average expense of $50 a month for wages, and $25 a month for keep for each man. A reasonable salvage reward for the services performed by the Coast Wrecking Company, in respect to the property received by the respondent, is 50 per cent. of the value of such property, which salvage really amounts to $6,314.65, but it was taken in the court below at $6,314.10.

From the foregoing facts I find, as conclusions of law, that the libelant the Coast Wrecking Company is entitled to a decree against the respondent for the sum of $6,314.10, with interest on said sum at the rate of 6 per cent. per annum from May 2, 1881, the date of the decree of the district court awarding to it that sum; that the libelants, the members of the firm of Johnson & Higgins, are entitled to a decree against the respondent for the sum of $1,223.82, with interest on said sum at the rate of 6 per cent. per annum from December 4, 1879, the date of the filing of the libel; and that the libelants are entitled to a decree against the respondent for their costs in the district court, taxed at $117.47, and for their costs in this court, to be taxed.          SAML. BLATCHFORD, Circuit Justice.

BLATCHFORD, Justice. It is objected by the respondent that the claim made in the libel is founded wholly on the bond signed, and is set up as a claim for general average charges, and that no suit to recover such charges can be maintained in the admiralty. It is also objected that the bond provides only for the payment of such losses and expenses, incurred and to be incurred, as may constitute a general average when stated according to the established usage and laws of the state of New York; and that there were no general average expenses incurred, inasmuch as the voyage of the Vindicator was abandoned, and all community of interest between vessel, freight, and cargo was destroyed. It is true that the libel is based on the bond or agreement, and that in reciting the agreement it recites it as one applying to an apportionment of only general average expenses. But the agreement is in evidence, and in the answer the respondent submits to the determination of the court the question of the amount of compensation to be awarded to the Coast Wrecking Company for salvage. The answer alleges that the claim of Johnson & Higgins is not one of admiralty jurisdiction, but there is no exception to the joining of the two claims in one libel. I concur with the district judge in the view that the agreement covers the expense of the services rendered by Johnson & Higgins, and their disbursements made in connection with the cargo, although the case may not be one of general average. The bond or agreement covers general-average charges. But it goes further; it recites general-average losses and expenses, and then it recites that there may be other charges incurred in respect to salvage and discharging the cargo, and sending it to New York, which may apply to and be due from specific interests, according to the usage of the port of New York. The signers then

agree to pay "the loss and damage aforesaid, and other incidental expenses thereon," according to their interest in vessel, freight, and cargo, provided "such losses and expenses aforementioned" be stated and apportioned by Johnson & Higgins in accordance with the established usage and laws of the state of New York in similar cases. This includes the expenses, disbursements, charges, and services sued for by Johnson & Higgins, because they were incidental to ascertaining and adjusting the proportionate share chargeable to the cargo of the expenses incurred in saving and discharging the cargo and delivering it, in addition to embracing such expenses.

As to the admiralty jurisdiction, the services and expenses covered by the agreement are those which, if performed and incurred by the owner of the vessel, would have fallen within the line of his duty to take care of and save the cargo. Such duty would have extended to all the disbursements and services of Johnson & Higgins. They would have been maritime in their nature, and their character is not changed or affected because the ship-owner put Johnson & Higgins in his place, and the liability of the owners of cargo to the ship-owner became evidenced by a written obligation in favor of Johnson & Higgins. This is an express contract for a maritime service. Everything that was done was incident to saving and delivering the cargo.

The propriety and lawfulness and reasonableness of the charges made by Johnson & Higgins are attacked, but there is no evidence opposing that of Mr. Krebs in their favor.

As to the amount of salvage to be awarded to the Coast Wrecking Company, it is contended by the respondent that all the services rendered at the wreck after January 26th were for the benefit of the vessel alone and with the hope of saving her, and not for the benefit of the cargo of the respondent, and that the cargo cannot be made to pay for unsuccessful efforts to save the vessel. It is also urged that the 50 per cent. salvage awarded by the district court was too large. But, even if the services in regard to the cargo be considered by themselves, it is impossible to determine what particular services were rendered in respect to the cargo of the respondent. The service in regard to all the cargo was a continuous service, and every part of the cargo was interested in the whole of it, and should bear its due proportion of the whole expense of saving all that was saved. The only proper or possible mode of fixing the salvage is to award a percentage of the value of the property saved. The district court has fixed that at 50 per cent. on a full and careful consideration of all

the evidence. That rate was adopted without litigation by all the owners of cargo except the respondent. Not only is the service in the particular case to be regarded, but the compensation is to be looked at, as it may induce aid by competent salvors to other property in distress; and the equipment of the Coast Wrecking Company, with steamers and pumps and wrecking material and skilled men, and its readiness to act on a moment's notice, must be considered, involving, as that does, large investments and expenses, which go on as well while there is no employment. Even the award of 50 per cent. in respect to the respondent's property will not give more than $12,-000 compensation beyond expenses for saving over $40,000 worth of property. This is liberal, as it ought to be, but I concur with the district court that it cannot, in view of all the circumstances, be considered excessive.

See same case in the district court, 7 FED. REP. 236.