## THE CITY OF WORCESTER.

### SCOTT v. THE CITY OF WORCESTER.

### SAME v. NORWICH & N. Y. TRANSP. CO.

*(District Court, D. Connecticut. July 17, 1890.)*

**SALVAGE.**
   A steamer valued at $237,500 was stranded on a dangerous reef on a foggy night. Her cargo, worth $100,000, and on which the freight was $601, was removed during the next day without danger; the day being pleasant and the water smooth. The next day was rough, and holes were worn in the steamer in addition to the cracks previously made. The prospect of getting her off depended on the weather, but the weather for the following week was fine, and temporary repairs were made; and at the end of seven days she was taken into a port for further repairs, and afterwards to a dry-dock. Two wrecking companies, with a large outfit, consisting of several steamers, barges, divers, etc., were in use about two weeks. *Held,* that the sum of $1,218 should be allowed for saving the cargo, and $31,753.52 for saving the steamer.

In Admiralty. Libels for salvage.
*Samuel Park* and *Walter C. Noyes*, for libelants.
*Allen Tenney* and *W. L. Putnam*, for respondents.

SHIPMAN, J. These are two libels for salvage. The first named is *in rem*, against the steam-boat City of Worcester, for salvage for saving the vessel, and the second is *in personam*, against the owner of the vessel, for salvage for saving the cargo, the service having been rendered at the request and for the benefit of the respondent.

The facts in the cases are as follows: The City of Worcester, a Long Island Sound iron passenger and freight steamer, of the value of $237,-500, having 50 passengers on board, and a cargo worth $100,000, upon which the freight money was $601, struck upon the south and west parts of Bartlett's reef, near the entrance to New London harbor, about 1 o'clock on Sunday morning, January 12, 1890. The night was very foggy. No lights could be seen. The vessel was going very slowly under one bell. The tide was flood. She was a fine steamer, was built in 1881 at a cost of $420,000, was and is owned by the Norwich & New York Transportation Company, and was regularly running between Norwich, New London, and New York. She lay upon the reef from her bow to her after gangway. She was drawing about 13 feet forward, and

about 10½ feet aft, and at low tide the water was about 5 or 6 feet deep on part of the reef. From her after gangway to her stern the depth gradually increased till the water was 16 feet deep under her rudder. Two of her five compartments filled with water on Sunday. On Monday another compartment filled. On Sunday the injury consisted in a crack about 35 feet long upon the port side forward, terminating in a hole 3 feet long nearly under one of the port boilers. The bottom of the reef is sprinkled with large boulders and rocks. On Sunday the vessel lay without a list. Information of the accident was promptly sent to New London, and the libelant, Scott, whose business is that of a wrecker, and who is the owner of a plant which is constantly ready for service, was notified by the local agent of the claimant at New London that his services were wanted. The president of the company soon after reached New London, knew of the employment of Scott, and ratified it. No contract was made with him either for a given sum or for any sum, or for a *quantum meruit*, or to pay him at all events. He entered upon the services as a salvor at the request of the claimant, and for its benefit. He started at about 4 o'clock with his steam-tug T. A. Scott, Jr., reached the vessel about 7 o'clock, took off all the passengers, and carried them to New London. He then returned with his tug-boats T. A. Scott, Jr., and the Cassie, and two barges of his own, with the steam-tug Briggs and barge Donald, belonging to the Thames Tow-Boat Company. The bill for the day's services of these vessels, amounting to $218, he paid. The day was exceptionally fine. The water was smooth. The barges were placed along-side of the hatchways of the Worcester. All the cargo was trucked into them by the steamer's men, and at half past 7 o'clock was safely out of the steamer, and was delivered by the libelant at New London, whence it was sent to its destination. This work was done without injury, accident, or danger. On Sunday morning the president of the company was justly afraid that Scott's equipment was insufficient for the work of pulling the Worcester from the reef. At his request, Scott telegraphed to the Merritt Wrecking Organization to send at once six pontoons and four steam pumps and boilers to work on the Worcester. In response to this telegram a barge and powerful wrecking steamer, the I. J. Merritt, was sent under the charge of Mr. Sharp, and arrived on Monday morning. Mr. Sharp wanted to know why the telegram had been signed by Scott instead of by the company. He was satisfied upon this point, and went to the reef on that afternoon. There was the same absence of contract with the Merritt Wrecking Organization that there was with Scott. Scott was wreck-master, and in charge of the work. On Monday forenoon the tackle, furniture, mattresses, and bedding were taken from the Worcester, and carried into New London by the libelant. Cement and sand were carried to the wreck, and Scott's men went to work closing the holes in the forward compartment from the inside. The sea was rough. There was a strong wind from the south-west, which became a gale at 4 o'clock in the afternoon. The Worcester "worried" or trembled upon the boulders, which wore a couple of additional holes in her bottom. Sharp, who was in charge of Mer-

ritt's men, made preparations to get anchors and cables laid to hold the Worcester easy on the rocks, but the cable got foul of the rocks, and there was some talk about the crew of the Worcester going ashore; but the wind abated, and they remained on the vessel. On Tuesday and the following days, till Saturday, the work of patching up the holes by the divers of Scott and the Merritt Company continued. Bags of cement mixed with sand were placed in the long break, and were braced in position. It was partly wedged upon the outside. The other holes were patched with planks which were clamped to the frame of the steamer. The water was then pumped out by the aid of 10 steam pumps. The steam-boat was pulled off the reef on the evening of Sunday, January 19th, was towed to New London, where the temporary repairs were still farther completed; and she was taken to New York January 26th for permanent repairs upon the dry-dock. She went under her own steam, but was accompanied by the I. J. Merritt. The equipment of the Merritt Wrecking Organization, which was in use, was worth $80,000. The steamer I. J. Merritt was in use 14 days, and the barge Blanche, 17 days. The steamers Cyclops and Dalzell, and schooner Edgar Post, which carried some of the outfit to New London, were in use 30, 37, and 48 hours, respectively. It furnished 8 steam-pumps, 2 divers and their apparatus, 7 engineers, 19 wreckers, 1 carpenter, 2 firemen, 1 foreman, and 1 agent, with the usual outfit of cables, ropes, hose, and anchors. Scott's equipment was worth $25,000 or more. The time of the steamers Alert, T. A. Scott, Jr., Cassie, and Chester amounted in all to 28½ days. The time of three lighters was 23 days. He furnished 4 divers and apparatus, 2 steam-pumps, 4 engineers, 2 firemen, and from 15 to 20 wreckers. His bills for the hire of vessels, materials purchased and used in repairs, sails used for patches, rope and anchors lost, amounted to $1,339.52.

Bartlett's reef is a dangerous place for a large steamer to be stranded upon. The injuries which the Worcester received cost $34,000 or $35,-000 to repair. During the rough weather of Monday the boulders ground two additional holes in her iron covering. If this weather had been repeated during the week that she lay upon the rocks, other damage would have been caused, and the difficulty and expense of getting her off proportionally enlarged. The reef is continually exposed to rough weather or storms in winter. It is not likely that an iron steamer would have gone to pieces, or have been broken in fragments; but the danger was that continued bad weather would have so increased the injuries that the expense of getting her off would have constantly increased, while her value was constantly diminishing. Both salvors and owners were fortunate in having favorable weather, which enabled the work to go on speedily and prosperously. Capt. Scott's opinion in regard to the prospects of success in the enterprise was a summary statement of the actual situation: "The chances were all owing to the weather. If the weather was good, we would get her off. If it was not, we wouldn't." Scott's steamer Alert struck upon the reef, and was compelled to undergo repairs for two days. The Merritt struck upon the rocks, but was got

off in about 20 minutes. The libel *in rem* was brought, by agreement of the two salvors, by Capt. Scott, for the benefit of himself and the Merritt Wrecking Organization; and by like agreement a single judgment is to be rendered for the joint services, and the court is not to divide the amount between them. The claimant has paid the Merritt Wrecking Organization $10,000 upon account, and Capt. Scott $1,500 upon account.

The services in saving the cargo were valuable, but were, in consequence of the exceptionally fine weather on Sunday, without danger,— were easily and quickly rendered. For these services the sum of $1,218 should be paid the libelant, of which $218 has been paid, leaving the sum of $1,000 due.

An important element which enters into the determination of the amount due upon the libel *in rem* is the fact that each salvor is the owner of a valuable plant, which is constantly ready for service, and equipped with a crew which is constantly under pay. The calls for salvage service are occasional. The necessity of expenditure for wages and repairs is continuous. The City of Worcester had the prompt benefit of a large plant, which was itself in some danger of injury. In *Coast Wrecking Co.* v. *Phœnix Ins. Co.*, 13 Fed. Rep. 133, Mr. Justice BLATCHFORD said:

"Not only is the service in the particular case to be regarded, but the compensation is to be looked at, as it may induce aid by competent salvors to other property in distress; and the equipment of the Coast Wrecking Company, with steamers and pumps and wrecking material and skilled men, and its readiness to act on a moment's notice, must be considered, involving, as that does, large investments and expenses which go on as well while there is no employment."

For services in saving the City of Worcester the salvors are entitled to $31,753.52, of which the sum of $11,282 has been paid, leaving the sum of $20,471.52 unpaid and due. In the libel *in rem* against the City of Worcester, let there be a decree against the claimant for the sum of $20,471.52 and costs of suit; and, in the libel *in personam*, let there be a decree against the respondent for the sum of $1,000 and costs of suit.