### THE ST. PAUL.

#### MERRITT et al. v. THE ST. PAUL.

#### SAME v. INTERNATIONAL NAV. CO.

(District Court, S. D. New York. July 24, 1897.)

1. SALVAGE—COMPENSATION—PROMPTNESS OF SALVORS.

   Promptness of salvors in reaching a stranded steamer, and thus preventing her from going further up the beach, and in getting everything in readiness to haul her off at the first possible opportunity, and thus avoiding the great damage incident to long-continued grounding, is an important element in determining the compensation.

2. SAME—WRECKING APPLIANCES.

   In fixing the amount of salvage, the importance of maintaining wrecking companies with powerful and costly appliances, ready at a moment's notice, by night or day, to repair to the scene of a disaster, is to be taken into consideration.

3. SAME—AMOUNT OF COMPENSATION.

   $160,000, awarded for 11 days' salvage operations by a large part of the wrecking force of the Atlantic coast, the total value of the appliances used being some $400,000, with the services of 205 men, and an outlay of about $10,000 in cash, which operations resulted in getting off the beach near Long Branch, N. J., the liner St. Paul, which was 535 feet long, valued at $2,000,-000, with a cargo worth $1,999,139, and freight amounting to $16,902.

4. UNLADING AND DELIVERY OF CARGO—SEVERANCE OF INTERESTS.

   Where a vessel is stranded near the end of her voyage, so that the cargo may be unloaded and delivered to the consignees, and such unlading is equally necessary for the lightening of the ship in order that she may be got off, and for the safety of the cargo, this part of the salvage operation is to be regarded as done in the common interest and for the common benefit, and the award, therefore, borne in common; but by such unlading and delivery there is a severance of interests, and the subsequent expense of getting the ship afloat must be borne by her alone.

5. SAME—CHARGE AGAINST SPECIE CARGO.

   No distinction can be made in the proportion of the salvage award charged against different portions of the cargo, and specie must bear the same pro rata charge with the rest of the cargo.

These were two libels, one in rem against the steamship St. Paul, and the other in personam against her owner, the International Navigation Company, to recover for salvage services rendered to the said steamer by the libelants, Israel J. Merritt and Israel J. Merritt, Jr., composing the Merritt Wrecking Organization, and the president and the directors of the Insurance Company of North America.

Cowen, Wing, Putnam & Burlingham, Carpenter & Park, Harrington Putnam, and Samuel Park, for libelants.

Robinson, Biddle & Ward and Henry Galbraith Ward, for claimant International Nav. Co.

Butler, Notman, Joline & Mynderse and Wilhelmus Mynderse, for interveners Crossman & Bro.

Carter & Ledyard, Edmund L. Baylies, and Walter F. Taylor, for interveners Van Bergen & Co.

BROWN, District Judge. The above libels were filed to recover compensation for salvage services rendered to the steamship St. Paul, which was stranded on the Jersey coast in a dense fog at North Long Branch, about 14 miles south of Sandy Hook, at about 10 minutes past 1 o'clock in the morning of January 24, 1896. She was got off on the 4th of February following. She was a new steel steamship of the finest class, finished about four months previous at a cost of $2,-650,000. Her cargo was valued at $1,999,139, more than half of which was in gold coin and bars, and the rest, about 700 tons, was of miscellaneous merchandise. This was all unladen into barges within a few days after the stranding, and was delivered to the consignees in New York before the steamer was got off the beach. The parties not having been able to agree upon the salvage compensation, the above libel in rem was filed on the 11th day of June, 1896, and an additional libel in personam was also filed soon after against the owners of the steamer, who had taken general average bonds from the consignees of cargo on its delivery to them for the payment of the shares of the salvage award properly chargeable against the cargo.

Crossman & Bro., consignees of the gold valued at $1,125,000, intervened in defense of their interests, claiming that a separation of the interests of the ship and cargo had been made before the ship was got off, and that the coin, from its small danger and easy handling, should be charged with but a small share of the whole award.

Van Bergen & Co., consignees of other portions of the cargo, likewise intervened for their interests, claiming that while the cargo should bear a less pro rata proportion of the whole salvage award than that charged to the ship, the rate charged against the cargo should be uniform, according to its value, without any distinction between the gold and the rest of the cargo. The shipowners contend that the danger of the steamer, as she lay ashore, was not serious; and that the whole amount awarded should be only a very moderate sum. The questions litigated concern the amount of the salvage award and the proportions in which the award should be distributed as between the ship and cargo. Most of the material facts have been agreed upon, or have been proved without serious controversy.

The St. Paul is 535 feet long on the water line and $63\frac{1}{2}$ feet beam. Her ordinary draft when loaded is 26 feet; at the time of stranding she drew 24 feet. The bottom of the beach where she went ashore is of shifting sand, with clay, and occasionally some rocks to the southward and outside of where the St. Paul lay.

Within two or three hours after she stranded word was received by telegraph at the offices of the Merritt Wrecking Company and of

the Chapman Derrick & Wrecking Company, in New York, both of which had large steamers specially fitted up with all appliances for wrecking purposes; and between 3 and 4 o'clock a. m., one large steamer was dispatched by each of those companies running by the lead down the coast through the thick fog. The tug Chapman was the first to reach the St. Paul. The tug Merritt arrived soon afterwards. The St. Paul was lying easily on the beach, heading southwest half south, or about three points towards the shore from the line of the beach. There was then considerable sea, and the spray was flying over the steamer's deck. As the sea receded the steamer had a list to port of 10 or 15 degrees, and her bow was in about 10½ feet of water at low tide.

The wrecking operations, by direction of Capt. Shackford, the marine superintendent of the International Navigation Company, the owners of the St. Paul, were put in charge of Capt. Merritt. When the news of the stranding reached Philadelphia, the president of the Insurance Company of North America directed the master of his wrecking steamer at the Delaware breakwater to proceed immediately to render assistance. She left the breakwater at 11:20 a. m. and reached the St. Paul a few hours afterwards. The wrecking steamer J. D. Jones was also ordered by the Merritt Company from Norfolk, and three large barges of the same company were also employed. The Chapman Company also sent another large tug, the Hustler, and also the Morse, and both companies supplied a great quantity of wrecking appliances and hired a considerable number of extra men and tugs for the unloading and transportation of cargo, as well as for other uses in the wrecking operations. The value of all the vessels and other property thus employed in the salvage operations by the three companies amounted to about $400,000; the number of men to 205, and the cash outlay up to the time when the steamer was floated, was from $10,000 to $11,000; the expenditure of the Chapman Company not having been precisely stated.

When the Chapman first reached the St. Paul, two wrecking anchors with cables of 200 fathoms were planted, leading from the port quarter of the steamer. On Capt. Merritt's arrival a few hours afterwards, these were shifted more to the northward, and two other large wrecking anchors were run out with 16-inch manilla cables to the St. Paul's starboard quarter. The wrecking anchors weighed from 6,000 to 7,000 pounds each. The passengers were all disembarked during the afternoon of Saturday, January 24th, by means of surf boats. For several hours before and after high water, which was about midnight, heaving on the lines was applied at intervals, until about 3 o'clock in the morning of Sunday, the 25th, during which time the ship was moved 156 feet astern. During the next three days, the sea being calm, with winds from off shore, i. e., from the westward, the ship could not be moved at all. During this time the cargo was all unladen into barges hired by the salvors, towed to New York and delivered to the shipowners, by whom it was soon delivered to the consignees on the execution of the average bonds as above stated before the ship was got off, or her situation materially changed. The discharge from the ship was completed by 10 a. m.

of Wednesday, the 28th. The specie was put on board the barge Hagerty during the forenoon of Tuesday, the 27th, and was taken to New York the same day.

At every tide, whenever there was any chance of moving the ship, efforts to move her were made, but for the first 10 days with no important results. On the 29th she was moved 24 feet astern; on the 30th, 6 feet; on the 31st, 6 feet; on Sunday, February 1st, 13 feet; on February 2d, none; on Tuesday, February 3d, in the forenoon, 28 feet. In the afternoon of that day a moderate gale sprang up from the eastward, which at night became strong, with a rough sea, and by 1:15 a. m. of February 4th, the ship was moved astern 276 feet. The gale continued from the northeast, with sleet and snow and a rising sea, and at a little past 9 a. m. of the 4th, with all the tugs towing, and at the same time heaving on the cables, with the steamer's starboard engine reversed full speed, the ship's stern swung out, and she was shortly carried well clear of the beach. She proceeded to New York under her own steam, and reached her berth early the same afternoon with comparatively small damage from the stranding. The whole time occupied in the salvage operation was a little over 11 days.

1. The enormous difficulty of this enterprise, owing to the vast size of the St. Paul, the great values of the ship and cargo, the success of the work, and the means and skill necessary to effect it, make the case one of peculiar merit.

To float the ship a very considerable part of the whole wrecking force of the country was brought into requisition, with plants organized and maintained at great expense for wrecking purposes alone, and the skill of persons engaged from 20 to nearly 50 years in this business. When it is urged, as the claimants do urge, that the danger of the steamer was not great as she lay stranded upon the beach, and that she was sure to come off when a rough sea and the lifting power of high waves should make it possible to pull her off, the help of all these extensive appliances and the trained skill and experience able to use them successfully, are presupposed. Without these powerful appliances and experience and skill in using them, I do not see the least reason to suppose that the St. Paul could ever have been got off the beach. The northeast storms, common in this locality and often heavy in winter, would naturally have carried her further up the beach, until some storm of exceptional severity, such as usually comes at least once during the winter or spring season, would have carried her high up, where relief would have been impossible. To prevent this and to save the ship, ordinary tugs and ordinary salvage work would have been impotent and useless. In my judgment, therefore, the St. Paul, without the immediate aid of great salvage appliances and skill, such as were here employed, would have been in extreme danger; and if none were supplied, she would have become substantially a total loss. Her engines might have been removed and a quantity of strippings taken from her; but the value of these would have been but a small fraction of the value of the steamer which the salvors saved comparatively unharmed.

Besides this, as it seems to me, there was an important element of

uncertainty in the whole enterprise, arising from the great length of the St. Paul (535 feet). Lying nearly parallel with the beach, there was danger, unless very speedily relieved, that by some unequal bearings of the keel or bilges upon the sand, which was liable to be eaten out by currents or by seas along different parts of her keel from stem to stern, or by her bearing in some places upon rocks or a hard bottom, she might be very greatly strained, or even broken, as was the iron steamship Russland a few years ago on the same beach; and this would involve either total loss or extreme damage. In the mild weather that preceded getting her off, the St. Paul was greatly favored; she lay easy, and yet suffered damage in her hull to the extent of about $100,000, besides the sum of $50,000 more in the sanding of her machinery, through the working of her propeller in getting off. Had she been driven up the beach by intervening storms before she could be got off or held secure in her position, as was the case with L'Amerique a few years before, near the same locality, the damage to her must have been far greater. The promptness of the salvors in reaching the steamer and thus preventing her going further up the beach, and in getting everything in readiness to haul her off at the first possible opportunity, and thus avoiding the great damage incident to long-continued grounding, is a most important element in this case. The City of Worcester, 42 Fed. 913. I must, therefore, regard the services of these salvors as of very high merit, not merely in rescuing the St. Paul from what, without any salvage aid, would have been nearly a total loss, but for the promptness of the aid which their great appliances enabled them to render, and thus to prevent any large damage to the ship. Without such ready means no adequate aid could probably have been prepared for such a ship as the St. Paul, without such delay as would have made rescue extremely doubtful. During the week following the day she was floated there were three easterly gales, during one of which the velocity of the wind was registered at 80 miles per hour—the highest ever registered in this vicinity. In fixing the amount of salvage awards, the importance of maintaining wrecking companies with powerful and costly appliances ready at a moment's notice by night or day to repair to the scene of disaster, has been repeatedly recognized. The Susan, 1 Spr. 499, Fed. Cas. No. 13,630; Coast Wrecking Co. v. Phoenix Ins. Co., 13 Fed. 127, 134; The Egypt, 17 Fed. 359; The City of Worcester, 42 Fed. 916; Kenn. Civ. Salv. 117, 118.

Considering all the circumstances, and after referring to the cases cited by counsel, and finding, for the reasons stated below, that 1.45 per cent. on the value of the cargo will be its proper share of the whole award, I have come to the conclusion that $160,000, including all the cash outlays, will be a proper award for the whole service. This award I should consider insufficient had the services been of long duration, or accompanied by any considerable danger to the persons or the property of the salvors. But these dangers were avoided by the favorable weather during which all the preliminary operations were performed, including the lightening of the ship to the utmost extent possible, consistent with her stability, by unloading all the cargo and by removing all her ballast that could be safely spared. No

previous salvage task has equaled this in magnitude, and the ship was saved with comparatively small damage. The amount awarded on the other hand, though not large, if measured by a percentage upon the values involved, seems to me to be a sufficient recognition of the importance of the services of the salvors, the necessities of the ship and the success achieved; and also to be sufficiently liberal to serve as an inducement to the maintenance, in the most efficient condition, of such wrecking companies as were here employed, without which the safety of the St. Paul could not have been so completely effected, nor could other steamers of her class, when stranded, be saved from great injury, and perhaps total loss.

2. Cargo. The circumstances of the present case, as respects the limited extent of the danger that was common to both ship and cargo and the consequent limited community of interest between them; and as respects the rights of cargo owners to a speedy delivery of their goods on a stranding like this, so near the close of the voyage, and the corresponding duty of the master as their representative, are almost identical with the circumstances in the case of L'Amerique, 35 Fed. 835, in which this court held, upon consideration at length, that the community of interest, and consequently the community of burden or expense, as between ship and cargo, were severed from the time they parted company. The unloading of the vessel being indispensable for the purpose of lightening her in order that she might be got off, and equally necessary for the safety of the cargo, this part of the salvage work was there regarded as done in the common interest and for the common benefit; and, therefore, under the adjudged cases, required to be shared in common; but it was held that in circumstances like the present, where the cargo has been unloaded for the purpose of making delivery of it to the owners by other means, there is no longer any community of interest between ship and cargo in the subsequent expenses of getting the ship afloat. The cargo has no interest in that work, not only because the ship is no longer needful to the cargo, but because it is not intended to make any use of the ship for the further prosecution of a joint adventure. The separation of interests is, therefore, complete from the time ship and cargo part company.

In cases like the present, it is obvious from the first that the necessities of the ship and cargo are wholly different. The work of relieving the ship is likely to be long, difficult and doubtful in result; relief for the cargo comparatively quick and sure. The dangers to the ship are not only much greater, but for the most part different in kind, from the danger to the cargo; and the means available and the measures required for the relief of each are so different, that no real community of interest exists between them beyond the time when the cargo is unloaded. After that is finished and the cargo is in safety, the principal and most difficult part of the work of getting the ship off still remains to be done. To hold the cargo chargeable for the expense of that work when it has no interest in the result of the work, would be an arbitrary appropriation and sacrifice of the cargo for the ship's use, with no benefit or intended benefit to the cargo, present or prospective; a sacrifice contrary to common reason and

equity. and to the recognized mutual rights of ship and cargo. See L'Amerique, supra.

If the stranding is light and the ship can be got off and is got off with the cargo on board, no doubt the whole service is a common charge. Reasonable efforts to that end, according to the circumstances, or if those efforts are not successful, then the unloading of cargo, which becomes equally indispensable to the safety of each, should be at the common charge pro rata, because wholly incurred for the common benefit. Beyond that the common charge should cease.

In deciding the case of L'Amerique, the adjudged cases up to that time were considered. I find no later cases holding differently under similar circumstances; while in the City of Worcester, 42 Fed. 916, a similar case, Judge Shipman made the same separation of interests between ship and cargo, and awarded about 1.2 per cent. on the value of the cargo, and about 13.4 per cent. upon the value of the ship, and this was affirmed on appeal. 45 Fed. 119. In the case of Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 349, 74 Fed. 564, also a similar distinction was made on appeal as respects specie removed before the salvage operations began; although in this court it was considered that the specie in that case ought to be held for its proportion of the salvage service in pumping out and raising the ship, because that service was made necessary by a previous voluntary act of sacrifice for the common benefit of the ship and specie alike, and because the salvage operation merely diminished the general average burden which the previous act of sacrifice had already imposed upon the whole cargo while the specie was still on board; the same as in the case of salvage services rendered to a ship and her cargo which had been voluntarily stranded for the common safety, or in case of goods necessarily jettisoned, and subsequently rescued by salvors.

The decisions above cited must be followed here. They require the pro rata charge to be limited to the period during which the salvage service was rendered for the common benefit. This was for a period of four days, viz., up to 10 a. m. of Wednesday, the 28th of January, when the unloading was completed. The whole salvage service occupied 11 days. The cargo is evidently not entitled to exemption for the first day's work, during which the passengers and mails were removed, and efforts made to move the ship without unloading. The removal of the passengers was the first duty of the master as the representative of the whole adventure, and that must be at the charge of the whole; and the efforts to move the ship before unloading were in the common interest.

No authorities, moreover, warrant treating the salvage of the ship and the salvage of the cargo as two distinct operations from the first; the exigencies of the ship would not permit two wholly independent salvage operations at the same time. There was but one salvage operation in fact; and, as I have said, there is no authority for severing it by construction, so long as the work is carried on for the common benefit.

Nor do the authorities justify any distinction in the proportion charged against different parts of the cargo. This point was well

considered by Sir R. Phillimore in the case of The Longford, 4 Asp. 385, and any such differences, even in favor of specie, were disallowed as illogical and liable to lead to great difficulties and embarrassments.

The proctors of the libelants and of the shipowners have stipulated that $1,500,000 may be taken as the value of the vessel. As the proctors of the cargo owners, however, do not agree to this, I cannot accept it in fixing the pro rata share of the cargo; and upon the other evidence I think the ship should be considered worth $2,000,000. Her pending freight was $16,902.

For the first four days' work, therefore, the share of the cargo will be a little less than two-elevenths of the whole award of $160,000; or more accurately, 1.45 per cent. on the cargo values. I therefore fix upon that percentage (1.45) as the proportion chargeable upon the cargo, amounting to $28,987.52, for which a decree may be entered in the libel in personam, with costs; and in the libel in rem, a decree may be entered for the residue of $131,012.48, with costs.