THE KAISER WILHELM DER GROSSE (nineteen cases).

(District Court, S. D. New York. January 31, 1901.)

1. SALVAGE—FIRE—HARBOR TUGS.
    Twenty-three harbor tugs, of the aggregate value of $300,000, extricated from the docks, which were on fire, a steamer worth $2,000,000. The moral certainty of great loss, except for their assistance, was the chief ground for a substantial reward. There was little danger to the tugs; the time of service was short,—an hour or two, except in the case of a few tugs, which, at the request of the ship, remained by her till the next morning, and there were other tugs present which could not find employment. *Held*, that $20,000 should be awarded for the service.[1]

2. SAME—APPORTIONMENT AMONG TUGS.
    In apportioning such award among the tugs, there will be kept in view: (a) Their time of arrival; (b) their value, size, and power; (c) their position, and the presumptive effectiveness of their services; (d) their aid in rescuing persons from the fire or the water; and (e) their remaining by, as requested, after the principal service had been performed.

3. SAME—RIGHTS OF CHARTERER AND OWNER OF TUG.
    The charterer, and not the owner, of a tug is entitled to the salvage earned; the charter being one of demise, under which the charterer received the bare boat, and agreed to return her in as good condition as received.

Shipman, Larocque & Choate, for claimant.

James J. Macklin, Foley & Wray, Alexander & Ash, and Wing, Putnam & Burlingham, for numerous tugs.

BROWN, District Judge. Twenty-three harbor tugs claim salvage compensation in the above 19 libels, for services rendered to the steamship Kaiser Wilhelm der Grosse in extricating her from fire at

[1] Salvage awards, see note to The Lamington, 30 C. C. A. 280.

the Hoboken docks at about 4 o'clock in the afternoon of June 30, 1900.

The fire was one of the most rapid and destructive that has ever occurred to the shipping in this port. It broke out at the docks of the North German Lloyd Steamship Company, in which many lives and much merchandise were lost, and three large steamers of the company were almost wholly destroyed. The largest steamer, the Kaiser Wilhelm der Grosse, with the assistance of the libelants' tugs, escaped with but comparatively little damage. Some of the lifeboats on the hurricane deck were damaged and numerous glass ports were cracked before the vessel could get out of her slip. These damages amounted to but a few thousand dollars, and they were repaired in season to enable the steamer to make her regular trip, with passengers and freight, a few days later. The libelants contend that without the aid of the tugs the Kaiser would have become a wreck like the other three steamers of the company; the respondents claim that she could have got out by her own steam, somewhat later indeed, but probably without any very great damage. The value of the Kaiser and her contents was about $2,000,000; that of the 23 salving tugs, about $300,000.

The fire started among some cotton in a shed on the bulkhead at the shore end of the company's pier No. 3. This shed extended northward continuously along the river front past pier 2 and pier 1 of the same company to the Thingvalla pier next above. In consequence of the presence of inflammable materials, the fire soon after it started ran northward through the shed with great rapidity, almost as through a flue. As the fire advanced upwards, a brisk wind drove the flames into the sheds that ran down piers 2 and 1, so that within 10 or 15 minutes from the time the fire broke out the whole vicinity of the bulkheads was enveloped in smoke and flame, and the upper part of the sheds on piers 1 and 2 were ablaze. Four of the company's steamships were moored alongside of piers 1 and 2 with their bows in and nearly or quite up to the bulkhead. The Kaiser Wilhelm was on the south side of pier 1. The Salle and the Bremen, respectively on the south and north sides of pier 2, and the Main, on the north side of pier 1, were in flames before either could be got out of the slips. The exit of the Main was obstructed by lighters which were outside of her in the slip, and it is suggested that her bows were also aground. However this may have been she was a mass of flames before she could be removed and her officers and crew were driven overboard. On the Salle many persons were confined by the flames below deck before any word of danger came to them, and perished. Numerous persons on the piers and on the other three steamers, as the flames advanced, were driven down the piers and into the water or upon other boats in the slips, where most of them were picked up by the various tugs that arrived, though quite a number were drowned.

The bow of the Kaiser Wilhelm der Grosse, on the south side of pier 1, was nearly or quite up to the bulkhead. She was 650 feet long by 66 feet beam, and she was at that time breasted off by spars

about 20 feet from the southerly side of pier 1 in order to enable her to coal from boats on her starboard side. Pier 1 was covered with a wooden shed extending down about as far as to the stern of the Kaiser. An extension of 200 feet had been added to the original pier which was not covered by a shed, and pier 1 was so much longer than the piers to the north and south of it. The fire was noticed from the Kaiser about the time it broke out, and her officers perceiving a few minutes afterwards that the fire was spreading to the northward, ordered all the lines and spar braces to be cast off and that the ship should be worked astern out of the slip. The lines and spars were speedily cast off, and a hawser running to the third bollard, about 110 feet from the outer end of the pier, was applied to the stern capstan, and the vessel was thereby very slowly warped astern nearly as far as to the third bollard. It was at about that time that the Easton, the first of the tugs, arrived. The only steam which the Kaiser then had on was in one of her 13 main boilers, which was used instead of a donkey engine for all the general purposes of the ship in port.

Most of the libelants' witnesses say that when their tugs arrived, the Kaiser was still and not moving astern. I am satisfied, however, from all the evidence, that this is a mistake and that even when the Easton arrived the Kaiser was moving astern, though very slowly; that the fire was already attacking the shed on pier 1, and that the great heat from this and the burning bulkhead had set fire to the forward starboard boats on her hurricane deck, though this was quickly extinguished by her own hose. Her officers and men, however, were soon driven aft. The fire on the bulkhead at that time was so strong that with the wind blowing directly toward the ship, there is no doubt that the fire would very soon have been running down the shed on the pier much faster than the Kaiser could move out by her own steam. The necessity for the assistance of tugs, therefore, to expedite her removal from the slip was very great. The anxiety of her officers for immediate assistance is sufficiently evident from their hails for help and their taking all ropes offered by the tugs on her port quarter, after six tugs were already pulling at her stern.

While it is impossible to say with certainty how great the damage to the Kaiser would have been without any help from the tugs, I have no doubt that their services in expediting her exit from the slip were of great value. She was unable to warp astern by her aft capstans over 200 feet, i. e. less than one-third of her length, and her slow movement and the set of the ebb tide would probably have carried her across the corner of pier 2 exposing her forward parts like those of the Bremen to heavy damage. She indeed had a fire pump in perfect working order, which, as I have said readily extinguished the little fire that broke out in the boats upon her hurricane deck; but in the smoke, heat and flame that rapidly extended down pier 1, she would have been utterly unable by her own fire pump to prevent very great damage to the steamer, had her removal beyond the shed on pier 1 been delayed even a few minutes longer.

The moral certainty of large loss except for the assistance of the tugs, is in the present case the chief ground of a substantial award. None of the other recognized circumstances enhancing salvage allowances exist in the present case in any marked degree. There was little or no danger to the salving tugs or to the crews that manned them. They kept at a safe distance from the fire, outside of the Bremen's stern, which was not burned, and in the lee of the Kaiser's huge bulk. The main service of the tugs was also very short, the Kaiser being hauled out into the river and out of actual danger in probably less than 15 minutes, though some further service was necessary in turning her around, head down stream, and coming soon after to anchor off Canal street; a number of the tugs also remained by her until an hour or two afterwards, when, having got up more steam of her own, she went, attended by several of the tugs, to a better anchorage off Forty-Second street. A few remained by her, as requested, until the next morning. A very important incidental service was, however, rendered by several of the tugs in picking persons out of the water who had been driven from the piers or had jumped overboard from the different steamers; and to this element due consideration has been given.

In determining what would be a proper sum to be divided among the various assisting tugs, the rule suggested by Mr. Justice Bradley in the case of The Suliote (C. C.) 5 Fed. 99, to which I have heretofore frequently referred, seems to me most justly applicable:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise, that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril."

In the case of The O. C. Hanchett, 76 Fed. 1003, 22 C. C. A. 678, the libelant appealed from the award as too small; but the judgment was affirmed by the circuit court of appeals on the ruling of this court, that:

"In harbor cases where tugs are abundant and on the ground or near by in time to give needed aid, large awards are not only unnecessary but contrary to the principle laid down by Mr. Justice Bradley in The Suliote (C. C.) 5 Fed. 99."

In the present case the evidence shows the presence of many more tugs than could find employment; and in such cases it is manifest that a totally different rate of compensation should be adopted from that given in cases like The St. Paul (D. C.) 82 Fed. 104; Id., 86 Fed. 340, 30 C. C. A. 70,—where the work could not be accomplished at all by means of ordinary tugs, but only through the previous creation and maintenance of a large and expensive plant, especially designed

for such business, having little or no other employment and maintainable only at a continual heavy expense.

For salvage services by ordinary harbor tugs it is sufficient that the awards shall be sufficiently liberal to induce in every emergency the most speedy repair to the scene of danger and the most heroic exertions to save property and life according to the exigency of the occasion. Applying this rule to the present case, and at the same time recognizing the great value of the service to the Kaiser Wilhelm der Grosse, including the incidental saving of life, I think $20,000, to be divided among the various tugs, will be a sufficiently liberal compensation, fully answering the above requirements, and in no way oppressive to the defendants. This amount will give to the various tugs, for an hour or two's service, from 25 to 50 times a full day's ordinary hire. I cannot doubt that this is sufficient to insure in all similar emergencies the most speedy and effective service of which such harbor tugs are capable.

In apportioning this sum among the different tugs, I have kept in view (a) their time of arrival; (b) their value, size and power; (c) their position and the presumptive effectiveness of their services; (d) their aid in rescuing persons from the fire or from the water, which was chiefly by the Dalzell, the W. Goodwin, the Fuller, the Quickstep and the Seven Brothers, a few persons being also picked up by the Valvoline, the Berwind and the Dewey; and (e) their remaining by, as requested, after the principal service had been performed. In the latter class were the Easton, the Moran, the Dalzell, the Seven Brothers and the Jason.

The Robert White, the Laurida and the Brilliant did not come up to the Kaiser until she was far out in the stream, and their services were so comparatively slight as respects the most important branch of the work, namely, getting her away from the fire, that only a trifling sum is awarded to either of them, and without including anything for the humane service of the Laurida in taking some 25 or 30 persons from pier 2 some time previous. So disconnected was this from the subsequent service to the Kaiser, that I can make no allowance for it here. All the remaining 20 tugs, even those that came last, rendered some service in hastening the removal of the Kaiser from the slip, which was the one essential thing. In this work so rapid was the fire that even moments were important. The six tugs, namely, the Easton, the Pulver, the Admiral Dewey, the Millard, the America and the Lenox, which pulled upon hawsers leading to the Kaiser's stern, worked to the greatest advantage, and in proportion to their power, rendered, therefore, the best service. They were also mostly the first on the ground, though several of the others that went on the port side of the Kaiser, arrived nearly at the same time, or but a few moments later. Some of the latter also, in pushing upon a line made fast to the quarter of the Kaiser at the same time that they also pushed at an angle against her side, would render almost as efficient service as if they pulled directly on the stern. Some others pushed only against the side to keep her port quarter up against the ebb tide, as she went out of the slip. As soon as the

stern of the Kaiser passed beyond the outer end of the pier this was no doubt of considerable importance, her speed being only moderate, as without this aid there was danger that she might sag down upon pier 2 and her forward parts take fire from the Bremen. I do not think the fact that the Bremen afterwards followed the Kaiser out of the slip without aid, makes against this view, inasmuch as Capt. Moeller, the local superintendent of the docks, ascribed the Bremen's movements to the suction caused by the Kaiser.

There is very great conflict in the evidence as to the order of arrival of the different tugs, and I shall not attempt to reconcile the discrepancies in the testimony. It is sufficient to assume that those that went there to do salvage work took positions which would be at once the most effective for the steamer, as well as the safest for themselves; and those positions were undoubtedly either directly astern, or on the port quarter as near the stern as the tugs could conveniently get. Those that were furthest from the stern undoubtedly came later than the others. The slip was also so narrow that there was not space sufficient for tugs heading up river to go inside of pier 2, and all on her port side were, I have no doubt, always outside of it; the space between the Bremen and the Kaiser was not only occupied in part by an ash scow and coal barge, but the stern of the Kaiser sagged down considerably as she moved out. Before the Seven Brothers and others later arrived alongside of the Kaiser, I have no doubt that her stern was considerably outside of the end of pier 1. The tugs themselves varied in width from 13 to 24 feet, and could not work conveniently within an average space of less than from 20 to 25 feet; so that the 14 tugs that worked against her side, the outer of which must have been at least 25 feet inside of her stern post, would have occupied, if they were about as near each other as they could well work, a space of over 300 feet, so that the Kaiser's stern must have been well out before the last tugs came in. Those that came last were undoubtedly of less importance. Had not moments been precious, all the tugs on the Kaiser's port side above half a dozen might be deemed useless. But as it was necessary to move the steamer out as soon as possible to prevent her forward parts getting afire, the fourteen tugs on her port side should all be deemed useful.

While the Kaiser, after being turned around, was slowly drifting down stream, being held in check by the tugs astern, a burning cotton lighter drifted diagonally under and across her stern and burned off the Dewey's hawser. The lighter passed along near the port quarter of the Kaiser, but without doing any further damage.

The Moran also in coming from the Kaiser's port quarter towards her bow, suffered some damage from the falling of a derrick or some timbers; but from the evidence I find that the Moran incurred this damage through her own fault in not keeping away after repeated warnings.

Remark should also be made upon the evident exaggerations and extravagances in the testimony of a number of the tugs' witnesses as to the importance of the work of their own tugs. Where this has

seemed to me to amount clearly to known untruthfulness, I have reduced the amount below what might otherwise have been allowed.

Taking all the circumstances into account, the sums named in the following list are as near a fair adjustment of the respective claims of the tugs as I have been able to make. After the first six, the next fourteen are in the order of the positions taken by them on the Kaiser's port quarter as nearly as I can determine from the evidence, although not precisely in the order of their arrival. The place of the Valvoline, however, is uncertain. She is not referred to by any of the other tugs; but from the details stated by her own witnesses and from their reference to the other tugs near her, I think her claim should be sustained, and in about the order I have assigned her.

The awards to the different tugs are as follows:

| | | | |
|---|---|---|---|
| Easton | $1,000 | Stevens | $ 700 |
| Pulver | 2,000 | W. Goodwin | 1,000 |
| Admiral Dewey | 2,600 | Dalzell | 1,100 |
| America | 1,400 | Cornell | 700 |
| Millard | 1,200 | Quickstep | 800 |
| Lenox | 900 | Seven Brothers | 650 |
| Fuller | 1,000 | Florence | 350 |
| Jason | 900 | Carroll Boys | 450 |
| Moran | 900 | Hawley | 300 |
| Berwind | 1,100 | Robert White | 60 |
| Valvoline | 800 | Laurida | 60 |
| | | Brilliant | 30 |

Of these sums two-thirds should go to the owners, and one-third to the officers and crew in proportion to their wages, except that a double allowance is to be given to the captains.

Decrees accordingly with costs.

(February 23, 1901.)

Upon the settlement of the decree a further question arose as to whom the award of salvage in favor of the owners of the Dalzell should be paid; whether to the general owners, or to E. Stearns Lighterage & Transportation Company, the charterer of the Dalzell, which at the time the salvage service was rendered was in possession and running her on its own account and at its own expense.

Peter S. Carter, for charterer.
Wing, Putnam & Burlingham, for general owners.

BROWN, District Judge. From the dealings between the parties and the subsequent payments, it is evident that during the few days' interval between the first written charter of the Dalzell and the second, the charterer was in the possession and use of her upon the same terms as before. It was during this interval that the salvage compensation was earned, which the general owner now claims for himself in whole or in part.

This charter was a charter of demise, under which the charterer agreed for the entire use of the vessel and to pay all the expenses of running her, including wages, coal and insurance. It received from the owner the "bare boat" and agreed unconditionally to return

her to the owner in as good condition as it received her, reasonable wear and tear alone excepted. If the vessel was damaged in any salvage operation, the charterer alone was bound to make good the loss. It was fully owner pro hac vice, and as such entitled to all her earnings including salvage. 2 Pars. Shipp. & Adm. 279. The case of The Scout (1871) L. R. 3 Adm. & Ecc. 512, is precisely in point. It is otherwise on a charter of affreightment only. The Waterloo, 2 Dod. 433.

Many charters contain an express clause providing for a division of any salvage earned. But I do not perceive any ground upon which I can decree such a division under a charter like this, in the absence of any provision for it in the charter. The stipulation for division often made, is made in order to modify the general rule. Such a provision directly affects the rate of charter hire, which is presumably lower, where the owner reserves a right to share in any salvage awards. I see no ground, therefore, in law or equity, upon which I can give the general owner any part of the salvage, to the prejudice of the charterer's right to it as a part of the earnings of the tug, to the exclusive use of which it was entitled by the charter of demise.