MURPHY and others *v.* SHIP SULIOTE.

*(Circuit Court, D. Louisiana.* ——, 1880.)

1. SALVAGE.—When a vessel is in distress and in danger of destruction, and calls on others for help, or, being abandoned, is saved by their voluntary efforts, it is a case of salvage, unless the salvors act in the performance of a mere duty, as where they are employed by the public authorities to perform the very service.

   *Held,* under the circumstances of this case, that if the fire department of New Orleans had extinguished the fire whilst the vessel was lying at the wharf, no salvage could have been claimed.

2. AMOUNT OF SALVAGE.—The amount of salvage that ought to be allowed depends on the extent and danger of the services, the risk to which the vessels and other property employed in the service were exposed, and the value of the property saved, and the risk of destruction by which it was imperilled.

3. SAME.—Salvage should be regarded in the light of compensation and reward,—not in the light of prize. It is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring efforts of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage. Anything short of it would not secure its objects.

Appeal from the decree of district court.

BRADLEY, C. J. The questions in this cause are—*First*, whether it is a case for salvage; *secondly*, if it is, how much compensation ought to be allowed to the salvors; *thirdly*, how it ought to be apportioned amongst them; and, *fourthly*, who are to contribute thereto.

Very little need be said on the first question. It being discovered shortly before 6 o'clock on the morning of the twenty-eighth of March, 1879, that the ship Suliote was on fire, the signal of distress was immediately given by ringing the alarm-bell, and messengers were sent out for assistance. In response to the call the tug-boat Belle Darlington, lying a short distance above, backed down alongside of the Suliote, and threw her hose on the deck of the latter, and commenced to play into the hatchway where the smoke was seen to issue, and was shortly afterwards joined by the Maud Wilmot and the Protector, and by their joint efforts the fire was extinguished. When a vessel is in distress, and in danger of destruction, and calls on others for help, or, being abandoned, is saved by their voluntary efforts, it is a case of salvage, unless the salvors act in the performance of a mere duty, as where they are employed by the public authorities to perform the very service. Had the fire department of New Orleans extinguished the fire whilst the vessel was lying at the wharf, no salvage could have been claimed. But, although the services of the department were offered, they were not accepted by those in charge of the ship. The vessel and cargo were saved by the voluntary efforts of those who came to her relief. We think the case is clearly one of salvage.

The amount of salvage that ought to be allowed for the services performed depends on several considerations; as, *first*, the extent and danger of the services; *secondly*, the risk to which the vessels and other property employed in the service were exposed; *thirdly*, the value of the property saved, and the risk of destruction by which it was imperilled.

The extent and danger of the service were inconsiderable. The Belle Darlington and Maud Wilmot were actually employed in throwing water only a few minutes—less than half an hour—though they stayed in the vicinity until the fire was

extinguished. The Belle Darlington was first on the spot, and first played on the fire in the hold, and remained, with the acquiescence of the master of the Suliote, to give further assistance, if necessary. She had five hands on board, including her master. The Maud Wilmot, after pumping a few minutes, was requested to leave, as her services were not required. The Protector, with 11 hands, including the master, was employed the whole of Friday and part of Saturday until the fire was extinguished. She belonged to the New Harbor Protection Company, and was constructed and furnished with powerful apparatus for extinguishing fires, and kept in readiness for that purpose. She employed not only water but carbonic acid gas, which, being forced into the hold with the hatches closed, extinguished the fire without injuring the cargo; perhaps not so effectually as water in penetrating the interior of the bales of cotton. This was shown by the revival of the fire two or three times when exposed to the air by the removal of the hatches. The master of the Suliote had special confidence in the efficiency of the Protector, which was the vessel for which he sent out messengers when the fire was discovered; and after she had commenced operations his reliance was placed on her alone. None of the vessels employed were exposed to any danger whatever. The Suliote was at the wharf, in still water, and all the operations were carried on without any risk to the vessels or the men except what was incurred by Higgins, who, after the removal of the hatches, descended into the hold, encased in armor, for the purpose of fastening the tackles to the bales required to be taken out of the ship. The fire had not made much progress; only 30 or 40 bales had caught, and only about 500 were taken out of the ship, although the whole cargo exposed to danger consisted of 4,100 bales. The fire had not proceeded so far as to render its extinguishment a matter of much difficuly with the appliances at hand, although this fact was not known until it was subdued.

The property in hazard was large in amount. The vessel was valued at $10,000, the cargo at $230,000, and the sum

which had already been expended in procuring and loading the freight amounted to nearly $10,000, all of which would have been sacrificed if the fire had not been stayed. The salvage allowed by the district court was 15 per cent. of the value of the ship, cargo, and net freight, amounting to nearly $67,-000; and, according to the rate of distribution adopted, giving to some of the men over $2,300 apiece, and ranging from that down to $1,500, $800, $400, and $200. The allowance to the Belle Darlington and the Protector was equal, and by giving the men of the former one-half of her allowance and to those of the latter one-fourth of hers, the men of the Belle Darlington received individually nearly three times that received by those of the Protector, although the latter were engaged the longest in the work.

From a review of the case we are not disposed to allow as much salvage as was awarded by the district court. The allowance of anything like a uniform percentage on the value of the property saved in such cases would be attended with great inequality and injustice. Whilst regard must be had to the value of the property, it is not the only controlling circumstance, and the other grounds of allowance in this case, as we have before seen, were quite inconsiderable. Looking at the amount of property saved, and the little exertion and risk required to save it, we think that 8 per cent. will be ample compensation for the service rendered. Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise, that which is intended as an encouragement to rescue property

from destruction may become a temptation to subject it to peril.

As to the distribution to be made of the award, in this cause, we think that it should be so regulated as to put the men belonging to the different vessels upon a footing somewhat in proportion to the service which they respectively performed, and we do not perceive any better method of doing this than by allowing the men belonging to each vessel a certain number of months' wages, graduated in some degree by the vessel's service. We think that the allowance to the master and men of the Maud Wilmot of two months' wages, to those of the Belle Darlington of three months', and to those of the Protector of four months', to be deducted, respectively, from the several amounts awarded to said vessels and their crews, will be amply sufficient. We concur with the district court in awarding to Higgins the sum of $500, and to Johnson $250. As to the award to be made to the respective vessels and their crews, we are of opinion that the sum of $2,000 should be awarded to the Maud Wilmot and her crew, and that the balance of the total salvage allowed, after deducting the amounts awarded to Higgins and Johnson, and to the Maud Wilmot and her crew, and the costs of this appeal, should be distributed, one-third to the Belle Darlington and her crew, and two-thirds to the Protector and her crew.

The property saved and liable to salvage consists of the ship, valued at $10,000; the cargo, valued at $230,000; and an equitable proportion of the freight. The gross freight was valued at £3,551 12s. 5d., amounting, at the rate of $4.84 to the pound sterling, to the sum of $17,189.84. But this had not been earned, and, indeed, if we consider the voyage as not having commenced, no part of it had even been equitably earned, and we were at first in doubt whether the freight ought to be taken into account. But the proof shows that the owners of the ship had, at the time of the fire, expended $9,316.50 in procuring, compressing, and loading the cargo. This was an investment in respect of the freight, and was saved to the owners by the saving of the ship and cargo,

whereby they were enabled to perform their contract. The amount of expenses thus incurred ought, in equity, we think, to contribute its proportion to the salvage to be paid. See *The Norma*, Lush. 124; Jones on Salvage, 191. This would make the total amount of property saved $249,316.50. From this amount will be deducted the costs in the district court, amounting to $1,510.15, which are chargeable to the claimants, and the 8 per cent. of salvage will be calculated on the balance of $247,806.35, amounting to $19,-824.51. The costs of appeal will be deducted from this sum as being chargeable to the libellants, and the balance will then be distributed as before stated. In this distribution no special allowance will be made to the Protector for the cost of gas or materials, that being taken into consideration in awarding to her two-thirds of the balance. In making this award to the Protector we have had regard to the fact that the value of her aid in affording salvage service is greatly enhanced by her being fitted and furnished for performing this kind of work. Being always ready and at hand, and powerfully efficient for the accomplishment of her purpose, a fire happening to any vessel in the harbor is bereft of much of its terror, and the damage actually ensuing therefrom is in most cases, and probably was in this case, greatly lessened in extent.

A reference will be made to the commissioner, F. A. Woolfley, to report the form of a decree to be entered in accordance with this opinion.

NOTE. See *Corwin* v. *The Barge Jonathan Chase*, 2 FED. REP. 268.

See ANSWER; COMPLAINT; COUNTERCLAIM; EXECUTION; JUDGMENT, 307; PARTIES TO ACTIONS; SHERIFF, 385.

A tax judgment is void for uncertainty if the amount is expressed only in numerals, with nothing to indicate what they represent. *Tidd* v. *Rines*, 201.