<hr/>

THE ALICE BLANCHARD (two cases).

(District Court, N. D. California. January 30, 1901.)

Nos. 11,308, 11,309.

SALVAGE—EVIDENCE—COMPENSATION.

    A steamer was disabled about 14 miles from a harbor, and about 4 miles from the shore, having a hole 6 by 12 inches in size, and about 6 inches above the water line, and had stopped for temporary repairs. The water was about 3 feet deep in her engine room, but her fires were not out, and the sea was smooth. A steamer with passengers and freight towed her to a neighboring port, the time consumed being about 3½ hours, where temporary repairs were made. The repairs were of such a character as to render the vessel free from leakage, and on the next day the injured vessel was taken in tow for San Francisco, using her own steam, and arriving there 54 hours after she was first taken in tow. The value of the rescued vessel, with her cargo, was $24,000, and that of the rescuing vessel was $68,000. The rescuing vessel was detained about 14 hours. *Held*, that there was no risk to the salvors or the vessel employed by them, and, as the rescued vessel was not at any time in serious danger, salvage to the amount of $1,000 would be allowed.

H. W. Hutton, for libelants Dodge and others.
Page, McCutchen & Eells, for libelants Meyer and others.
Andros & Frank, for respondent.

DE HAVEN, District Judge. These actions, tried as one, were brought to recover compensation for salvage services alleged to have been rendered by the steam schooner Farralone, her master and crew, to the steamer Alice Blanchard. The facts are these: On the 17th day of November, 1896, the Farralone, with passengers and freight, bound on a voyage from Coos Bay to San Francisco via Port Orford and Humboldt Bay, sighted the steamer Alice Blanchard lying broadside to the swell, and apparently disabled, at a point about 14 miles north of Port Orford, and 4 or 5 miles off shore. The Farralone immediately changed her course and steamed to the Alice Blanchard, for the purpose of ascertaining her condition and rendering to her such assistance as might be required. The Alice Blanchard had met with an accident whereby a hole 6 by 12 inches in size, and about 6 inches above the water line, had been stove through her bow, permitting the entrance of water into her hold when she was under headway, and also when not under headway whenever her bow dipped into the sea. In this disabled condition she had been stopped for the purpose of making temporary repairs. The water was between 3 and 4 feet deep in her engine room when the Farralone came up to her, but her fires were not out. Her engines could have been worked, though not without danger of injury to them by reason of coal dust mixed with the water in which they were partly submerged; and at that time the hole in her bow had also been covered with can-

vas and boards in such manner as to prevent further leakage so long as this covering or patch should remain in place. The weather was fine and the sea was smooth, with a dead swell setting in shore. In view of the temporary nature of the repairs made, and the time that would be required to free his vessel from water so that her engines could be worked without danger of resulting injury to them, the master of the Alice Blanchard deemed it prudent to accept the Farralone's hawser; and his vessel was towed into Port Orford by her, reaching there about 6 o'clock in the afternoon. The time consumed in this service did not exceed 3½ hours. Upon arriving at Port Orford the Alice Blanchard's temporary repairs were removed, and a double patch, consisting of two thicknesses of heavy cotton canvas, tarred, and 2-inch planking, covering a space 4 feet by 4 feet 6 inches, was placed over the hole in her bow, and securely fastened by means of nails and bolts. These repairs were of a substantial character, and rendered her free from leakage, and perfectly safe in any condition of weather or sea. The vessels remained in Port Orford for 5 hours, and then, on November 17th, at 11 o'clock p. m., proceeded to San Francisco, the Farralone having the Alice Blanchard in tow. When she arrived at Port Orford the water in the hold of the Alice Blanchard had been lowered 18 inches by pumping and the use of buckets, and a siphon was there obtained from the Farralone, by the operation of which and her pumps the steamer was entirely freed from water by 2 o'clock the following morning; and at 7 o'clock of the same morning her engines were started, and, although she continued in tow of the Farralone, were worked up to their full capacity during the remainder of the voyage to San Francisco. The ordinary speed of the Farralone is 10 knots an hour, and that of the Alice Blanchard 8 knots. The vessels arrived in San Francisco on November the 19th at 9 o'clock p. m., 54 hours after the Farralone first took hold of the Alice Blanchard, and during 49 hours of which time the latter was in tow of the former. In rendering this service the Farralone was delayed about 14 hours; that is, if she had not had the Alice Blanchard in tow, she would have arrived in San Francisco about 14 hours earlier than she did. The weather was fine during the entire voyage, and the towing was good. The value of the Alice Blanchard was $20,000, and that of her cargo $4,000. The Farralone was worth $60,000, and she had on board a cargo of the value of $8,000.

That the case as presented is one in which salvage compensation should be awarded is not disputed, and the only questions are as to the amount and its apportionment among the libelants. In the case of The Clifton, 3 Hagg. Adm. 118, it was said by Sir John Nicholl:

"The ingredients of a salvage service are: First, enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow creatures and to rescue the property of their fellow subjects; secondly, the degree of danger and distress from which the property is rescued,—whether it were in imminent peril, and almost certainly lost if not at the time rescued and preserved; thirdly, the degree of labor and skill which the salvors incur and display, and the time occupied; lastly, the value. Where all these circumstances concur, a large and liberal reward ought to be given; but, where none or scarcely any take place, the

compensation can hardly be denominated a salvage compensation. It is little more than a mere remuneration pro opere et labore."

The rule thus stated is one by which courts of admiralty are constantly guided in this class of cases, and was, in substance, repeated by Mr. Justice Bradley in Murphy v. The Suliote (C. C.) 5 Fed. 99, in the following language:

"The amount of salvage that ought to be allowed for the services performed depends on several considerations, as: First, the extent and danger of the services; secondly, the risk to which the vessels and other property employed in the service were exposed; thirdly, the value of the property saved, and the risk of destruction by which it was imperiled."

And in the same opinion this distinguished judge added:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage. Anything short of it would not secure its objects. The courts should be liberal, but not extravagant."

In the light of the general rule declared in the foregoing cases, it is at once seen that the court would not, on the facts shown in the present case, be justified in holding that the libelants are entitled to a very large award. The service upon which the claim for salvage compensation is based was rendered with little, if, indeed, any, risk to the salvers, or to the vessel employed by them in such service. The Alice Blanchard was not in imminent danger, and might have made Port Orford in safety without assistance, although, in her disabled condition, it would not have been prudent for her master to have refused assistance, and towing her into Port Orford was clearly a salvage service; but after this there was no further need of the services of the Farralone. The anchorage was, in the then state of the weather, good at Port Orford, and the steamer before leaving there was repaired in such substantial manner that she was fully able to make her way to San Francisco without further assistance. The fact that her master, without being compelled thereto by necessity, consented to be towed from Port Orford to San Francisco, does not entitle the libelants to recover compensation for the towage between those ports, estimated upon the same liberal scale as if such towage could be regarded as having been rendered in the performance of a salvage service. Upon consideration of all the facts, my conclusion is that libelants are entitled to recover $1,000, with interest thereon from November 19, 1896; said sum to be apportioned between them as follows: Three-fourths to the owners of the Farralone, and one-fourth to her master and crew, in proportion to their wages. And there will be a reference for the purpose of ascertaining and reporting the several amounts to which the master and the members of the crew are entitled. The libelants to recover costs.