## THE ROSALIE MAHONEY.

### (District Court, S. D. Florida. February 6, 1918.)

SALVAGE ⟢31—RIGHT TO COMPENSATION—RESCUE OF STEAMER ON FIRE.

A steamer lying at a dock in St. Johns river, Florida, partly loaded with creosoted cross-ties and piling, took fire early in the morning. She was cast off by the dock master, and at his request a tug towed her across the river, beached her, and then began pumping water on the fire. After pumping nine or ten hours, with the assistance of another tug, which came after four hours, the fire was put out; but a hole was cut in the side of the steamer, and she was filled and sunk. The first tug stood by for three or four days, until she was raised by a wrecking dredge, and then towed her to a port. The steamer had on board, besides cargo, tanks containing about 1,500 gallons of fuel oil; but the tanks were equipped with vents, so that there was little danger of explosion. The value of the vessel, oil, and cargo was $102,000. *Held,* that the two tugs were entitled to salvage compensation; that they were not entitled to pay for cutting a hole in the steamer and filling her when the fire was virtually out, which was unnecessary and a cause of loss, and detracted from the merit of the service, nor was the first tug entitled to any allowance for standing by, which was not necessary; that its two tugs and their crews would be awarded $5,000, two-thirds to the first tug and her crew.

In Admiralty. Suit for salvage by Maurice Bowden and others against the steamship Rosalie Mahoney, with the Cummer Lumber Company and the Jacksonville Forwarding Company as intervening libelants. Decree for libelants.

N. P. Bryan and L. R. Milton, both of Jacksonville, Fla., for libelants.

E. J. L'Engle, of Jacksonville, Fla., for respondent.

George C. Bedell and D. H. Doig, both of Jacksonville, Fla., for interveners.

CALL, District Judge. In this case two libels were filed, claiming salvage for service rendered the tramp steamship Rosalie Mahoney while on fire. The first libel was filed May 4, 1917, by the engineer of the H. M. C. Smith, a tugboat, on behalf of himself and the crew of said tug and one Ernest Williams, then on said tug, but not a member of the crew. The second libel was filed May 19th, by the Jacksonville Forwarding Company, owner of the steam tug Volunteer, for itself and the crew of said tug. On May 21st the Cummer Lumber Company, owner of the tug H. M. C. Smith filed an intervention inter esse suo. These suits were consolidated by order of the court.

Before proceeding with the consideration of the case, I desire to call attention to proctors to rules 41 and 48 of the admiralty rules. Rule 48 reads as follows:

"Salvors having a common interest arising from associated service or from consortship shall unite in one libel."

This rule has not been followed in this case, but the crew of the Smith proceeded for themselves, without reference to the claims of the other salvors, and failed to comply with rule 41, in that the libel does not state the amount claimed for salvage. The facts deducible from the evidence may be stated as follows:

About 6 o'clock on the morning of April 28, 1917, the steamship Rosalie Mahoney, while lying at the Eppinger and Russell docks, on the St. Johns river, loading with creosoted cross-ties and piling, and when about two-thirds loaded, was discovered to be on fire. This fire, commencing in the boiler room, quickly spread to the superstructure amidships, where the officers' quarters were, and necessitated the officers and crew leaving the vessel and going upon the dock to which the vessel was moored. The superintendent of the dock, fearing that the fire would be communicated to the dock and lumber stored upon it, caused the lines of the vessel to be released, and she thereupon floated with the wind and tide to a bank to the north of the dock, where she grounded, variously estimated by the witnesses as distant from the dock 40 to 150 feet.

While the vessel occupied this position, the captain of the H. M. C. Smith, then lying at Cummer's mill, a mile and a half down the river, saw the smoke and came to the place. Here some conversation took place between the captain and the dock superintendent relative to the towing of the vessel further from the dock, and the sums of $10 and $15 were mentioned for such service. The Smith then proceeded to the vessel. A line was put upon the vessel by one of the firemen and Ernest Williams, and the vessel towed stern first across the river and grounded. The tug moved around the vessel and played water upon the fire until about 10 o'clock, when the fire was so far under control that the tug could make fast alongside and continue

the operations of extinguishing the fire. About this time the tug Volunteer came and assisted with streams from her fire pumps in putting out the fire; also the government boat Issis pumped water on the fire for some two hours. After these boats had been so engaged, the superintendent of the Forwarding Company came upon the scene, and a hole was cut in the hull of the vessel, and water pumped in by the two tugs until she filled, which was about 2 o'clock in the afternoon. The vessel remained in this position until about May 1st, when with the assistance of the dredge Reliable she was pumped out, and on May 2d, towed by the Smith to the municipal docks and delivered to her owners; the tug Smith remaining alongside the vessel from April 28th to the time of her delivery to the owners on May 2d.

In addition to the cargo of railroad ties and piling, there was in the vessel's fuel tanks some 1,500 gallons of marine fuel oil. These tanks were on the deck forward and aft, and there were smaller tanks in the boiler room. Each of these tanks were fitted with vents to allow the escape of any gas which might form in them. The testimony further shows that the tug Volunteer arrived at the scene of the burning vessel some 15 or 20 minutes before the Smith, but made no effort to render any assistance until about 10 o'clock, after she had performed service for other vessels not endangered, except a lighter which had caught from the burning vessel. The Volunteer pumped water upon the fire and into the vessel for probably about five hours. The dredge Reliable makes no claim to salvage. Her compensation for pumping out the vessel was arranged by contract.

Each of these tugs were fitted with fire pumps, but had no hose larger than 1½-inch until late in the day, when some 2½-inch hose was procured. The Smith had a Niagara nozzle on top of her pilot house, which she used, as well as the small hose.

The values of the salved property was fixed by agreement and are as follows:

| | |
|---|---|
| Value of ship, | $ 90,000 00 |
| Value of fuel oil | 2,219 34 |
| Value of cargo | 10,454 84 |
| | $102,674 18 |

As I understand the procedure in this class of cases, it is proper that the court should allow an amount to be paid the salvors, the division of this amount among the vessels and men engaged in the salvage service to be divided among them as the facts of the case shall make equitable; the owners of the vessels engaged being entitled to remuneration for the use of and risk to such vessels, and the men for the labor, risk, etc., undergone by them.

"Salvage is a reward for meritorious services in saving property in peril on navigable waters, which might otherwise be destroyed, and is allowed as an encouragement to persons engaged in business on such waters, and others, to bestow their utmost endeavors to save vessels and cargoes in peril." The Sonderburg v. Towboat Co., Fed. Cas. No. 13,175.

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune, conferred without regard to the loss * * * of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortu-

nate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagent; otherwise, that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril." Murphy v. The Suliote (C. C.) 5 Fed. 102.

Again, the same court, on the same page, says:

"The allowance of anything like a uniform percentage on the value of the property saved in such cases would be attended with great inequality and injustice. Whilst regard must be had to the value of the property, it is not the only controlling circumstance."

The other controlling circumstances are: (1) Labor expended by the salvors. (2) The promptitude, energy, and skill displayed. (3) The value of the property employed by salvors. (4) The risk incurred by salvors. (5) The degree of danger from which the property was saved.

In the instant case the Smith was engaged in fighting the fire about nine or ten hours, including the time she was engaged in towing the burning vessel across the river. I think she displayed reasonable promptitude, skill, and energy in rendering aid. There is no satisfactory proof of the value of the vessel. The customs house record is given, and this shows her to be a rather old vessel.

The risk incurred by salvors or the vessels employed was not great. Stress is laid upon the presence of the fuel oil in the tanks; but since each of these tanks contained vents which would prevent an explosion, and since the flash point of such oil is very low, it does not seem to me that its presence added materially to the danger of the salvors or the vessels engaged in the salvage service. The value of the property saved is fixed by agreement as heretofore stated.

The degree of danger from which the property was saved was great. The cargo, consisting of creosoted cross-ties and piling, carried in the hold and on the deck, constitutes a great danger in case of fire. It may be true that the creosote, being easily set on fire, would burn off, charring the wood; yet I cannot imagine such a condition of the cargo not greatly endangering the vessel while such burning was in progress.

From the testimony it seems to me that the vessel and cargo would have been a total loss, but for the services of the Smith and her crew, aided by the Volunteer and Issis. It seems to me that the Volunteer and her crew showed little promptitude in coming to the rescue of the burning vessel. As before noted, the testimony shows she was at the scene of the fire some 15 or 20 minutes before the Smith arrived, but made no effort to extend aid. On the contrary, she devoted her attention to saving a lighter belonging to her owners, and performed other services to other vessels, until about 10 o'clock, before proceeding to the aid of the Smith in putting out the fire, and this although equipped with fire pumps probably more powerful than those on the Smith.

Again, the filling of the vessel with water after the fire was virtually out appears to me totally unnecessary, and the cause of additional loss to the owners of the vessel. The Smith cannot excuse herself for

participation in this proceeding; she being in charge of the operation, it was the business of her officers to have prevented this unnecessary act. I do not think the services rendered in pumping out the vessel should be allowed in considering the salvage award.

The Smith laid alongside the vessel from the evening of April 28th to May 2d. From the letter of the owner filed in evidence this seems to have been done at its command. It was not necessary for the preservation of the property; the vessel then being filled with water and aground, with an anchor out. The time the Smith was lying alongside cannot constitute any basis for consideration of the amount of salvage. It was at the behest of the owner of the tug, and the owners of the vessel cannot be held liable to pay for such service. It will be further borne in mind that the service was performed in daylight and on the smooth waters of the St. John's river.

The proximity to Jacksonville and its fire department, and the presence of other boats which might have rendered assistance, is stressed. But it does not seem to me that such consideration should weigh much in fixing the amount to be allowed in the case. It is true the chief of the Jacksonville fire department was present, but the testimony is silent as to any assistance rendered. The vessel had been released from the dock, and was then grounded to the north of the dock, upon his arrival on the scene, and the testimony does show that the Smith was the only boat which came to the rescue of the burning vessel until approximately 10 o'clock.

The towing of the vessel across the river is criticized to some extent. It is evident that the dock foreman thought the dock in danger from the burning vessel as she lay upon the bank. A lighter had already caught fire, and under the circumstances the fears of the dock foreman do not seem unreasonable. The action of the captain of the Smith in removing the vessel to the point he did was not such an act as should militate against the boat and crew in assessing the amount of salvage.

Claim is made that the captain of the Smith was injured in rendering the salvage service. I gather from the testimony the injury was received while cutting the hole in the side of the vessel. This, as before remarked, was unnecessary, and will not be considered in the light of salvage.

Taking into consideration the facts, as shown by the testimony, with the well-known rules to govern courts in fixing the amount of salvage, I am of the opinion that $5,000 would be proper to be allowed in this case. This amount to be divided between the Smith and Volunteer, three-quarters to the Smith and one-quarter to the Volunteer. Of the amount apportioned to the boat, two-thirds shall go to the owner and one-third to be divided among the crew in proportion to the wages of each, except in the case of Ernest Williams, who will receive the amount apportioned to a fireman on the Smith.

The amount awarded above and the costs will be paid by the vessel and cargo in proportion to the values same bear to each other. The services rendered by the Issis are not included in the above award.

A decree will be entered accordingly.