## FARM MORTGAGE & LOAN CO. v. WILLETT et al.

(District Court, W. D. New York. April 3, 1923.)

No. 1959.

Courts ⊙⟹354—Judgment on verdict may be entered by clerk in vacation, in conformity with state practice.

A state statute authorizing the clerk to enter judgment on a verdict, either during the term or in vacation thereafter, is controlling in a federal court, and the court is without power to set aside a judgment because so entered in vacation.

At Law. Action by the Farm Mortgage & Loan Company against James D. Willett and Cora G. Willett. On motion to vacate judgment. Denied.

---

## THE ETNA.

(District Court, S. D. Texas, at Houston. April 28, 1923.)

No. A. D. 1046.

Salvage ⊙⟹18—Use of city fire boat in extinguishing fire on vessel held not to deprive volunteers of right to salvage.

While respondent vessel, loaded with grain, was lying tied to a pier, both pier and vessel took fire from a very destructive fire on shore. A city fire boat was lying across the slip, but was not manned. One of libelants, who was not a member of the fire department, collected volunteers to man the boat which rendered effective service in saving the cargo of respondent vessel. *Held,* that the fact that the fire boat was the instrument used, and was in part manned by fireman or others under duty to render service, did not deprive the volunteers who were not under such duty of the right to salvage compensation.

In Admiralty. Suit for salvage by Frank P. Malloy and others against the steamship Etna. Decree for libelants.

McDonald & Wayman, of Galveston, Tex., for libelants.

Loomis & Jones, of New York City, and Williams & Neethe, of Galveston, Tex., for claimants.

W. T. Armstrong and W. E. Cranford, both of Galveston, Tex., for cargo.

HUTCHESON, District Judge. On the night of September 30th in the harbor of Galveston, at or near Pier 35, a fire began in the sulphur concentration sheds, which rapidly developed, as the fire chief testified, into one of the worst fires that Galveston has ever seen.

The steamship Etna was lying in a slip, tied up to Pier 35 near the concentration sheds. The extent of the fire was such that a great concourse of people assembled at it, and not only the fire department, but volunteers from among the citizens, and from among the National Guard, who were then stationed in Galveston on strike duty, assisted in extinguishing it.

At the height of the fire, when the pier to which the ship Etna was tied was on fire and in the process of destruction, and when the ship Etna herself was a mass of flames, the regular city fire boat Clarke was tied up at Pier 34 on the opposite side of the slip from the Etna, doing nothing toward extinguishing the fire on the Etna.

While matters were in this situation, Frank P. Malloy, who had for many years been a city fireman, and for a part of the time chief of the fire department, but who at the time of this fire was not a member of the department, noticed that the tug Clarke was not fighting the fire, noticed the dangerous predicament in which the Etna was, and approached the fire chief, Ryan, telling him that something ought to be done to save the Etna. Getting no response from the fire chief, he then went over to the Clarke, and went to the captain, calling out:

"Gentlemen, it is a shame for you to be on this side of the slip, and leaving that ship to be burned up there."

To the reply of the captain that he had no men to handle the boat, Malloy offered to get men, and he testified:

"As men were running to the fire, I would holloa at them, and grab them, and tell them to get on the boat."

In this manner, and with the assistance of the officers of the National Guard, which was then doing strike duty at Galveston, enough men were assembled to man the boat, and the pumps. She was taken across the slip to the Etna, and her pumps then commenced playing on the fire; the Clarke lying by until about 7:30, when the fire was out, and the men were withdrawn. This activity continued for something like four or five hours.

When the fire finally went out, practically all of the inflammable material on the Etna above the water line had been destroyed, and her damages were such that she was repaired at a cost of nearly $200,000. She had a full cargo of wheat, which sustained practically no damage.

The agreed testimony shows that the steamship was worth before the injuries some $600,000, fully loaded with about 253,000 bushels of

288 F.—37

wheat of the value of about $400,000. That the damage to the wheat was only about $5,000.

This suit was brought by Frank P. Malloy, George Butterowe, Jr., Richard Sterling, and Mike Kuchtaruk, members of neither the fire department nor the National Guard, and also by some members of the crew of the fire boat.

While the case was on trial, the libelants, members of the fire department of the city of Galveston, dismissed their claims, and the case remains for decision only as to the four libelants, not members of the crew, above mentioned.

The claimants of the steamship Etna and of the cargo deny the claim to salvage on the part of these libelants, affirming:

(1) That though these men were volunteers, and in the strict sense of the law under no legal obligation to perform the service which they did perform, they performed the service as volunteer members of the fire department, and not as separate and independent salvors, and that the same rule which disentitles the fire department to a recovery also applies as to them.

They assert in addition that no real service was rendered; that everything inflammable on the Etna was burned anyway, and as to the rest of the cargo it would not have burned, and would not have suffered any greater damage than it did by the salvage had the efforts of libelants not been expended.

The only case in the books to which either side has referred me, or which I myself have been able to find, in which the question at issue has been directly passed upon, is the case of Davey v. The Mary Frost, 7 Fed. Cas. No. 3591 (District Court), Id., Fed. Cas. No. 3592 (Circuit Court), involving a fire in the harbor of Galveston on January 11, 1876.

The opinion of the District Court treats the matter as though the claimants were all city firemen, and denies recovery to the libelants on that ground.

The opinion of the appellate court, however, is not so limited, and is direct authority for the proposition that neither the firemen nor those volunteering to help them can recover. In the opinion by Justice Bradley the following significant language is used:

"Some of the libelants were not firemen, but all of them acted under the orders and direction of the chief engineer. There are always volunteer helpers at fires. It is an instinct of every good citizen to do all he can to suppress a fire, but the fact that some who were not enrolled in the service aided in putting out the fire does not detract from the truth of the general proposition, that the fire department extinguished this fire."

And further:

"I cannot regard this case as any other than the extinguishment of a fire in a ship lying at the wharf of Galveston by the aid of the fire department of that city. The question is whether it is a case for salvage. In my opinion it is not."

The libelants deny the binding force of The Mary Frost Case as applied here, claiming that the expressions in that case with reference to volunteers were mere dicta, because as a matter of fact there were no libelants except members of the fire department.

The opinion in its direct statement does not admit of being consider- ed dicta, but in addition the original record on file in the court at Galveston shows that some of those helping were not members of the fire department.

(2) They contend that this case should not be decided under the influence of that, because, while there the fire department was in charge of the fire and the volunteers were merely aiding under direction, here the volunteers organized and set in motion the fire department, so that in a true sense they, and not the fire department, were the active agents in extinguishing the fire.

This distinction does not impress me as sound. If The Mary Frost Case is authority for the view that volunteers who act under the direction of the fire department cannot recover, it is equally authority for the proposition that the volunteers who have the fire department acting under their direction cannot recover, for it ought to be plain that there can be no difference as to the status of the volunteer fireman whether he follows or leads the department.

A stronger proposition of libelants is that the expressions in the Mary Frost Case, which, while perhaps not real dicta in the sense that they did not relate to the particular controversy, yet are to be considered as limited to the facts of that particular case, and as not expressive of a general rule. That the case here is ruled rather by the decisions in The Roman Prince (D. C.) 88 Fed. 336; The General Knox (D. C.) 74 Fed. 575; The Despatch (D. C.) 50 Fed. 611; The Barnegat (D. C.) 55 Fed. 92; and The Blackwall, 10 Wall. 1, 19 L. Ed. 870—in which salvage awards were allowed to volunteer tugs which co-operated with the fire department. They urge with some show of merit that the fact that these libelants were actually on the fire boat and actually operating the fire boat apparatus makes the case no different from those above cited, where the co-operation between the crews of the tugs and the crew of the fire boat was maintained on the decks of two separate bottoms.

Considering the matter as of first impression, and uninfluenced by the decision in The Mary Frost Case, the matter presents a point of great difficulty. That these four men did, without being under legal obligation to do so, perform services in endeavoring to extinguish the fire upon the steamship Etna, stands undisputed. Though the efforts were made in connection with, and were made effective through, the use of the city fire department, some members of the fire department, and some volunteers from the National Guard, it is yet indisputable that these forces were mobilized and put into action by the efforts of Malloy.

While it is true that the fire on the Etna was a part of a general conflagration at the docks, to the extinguishment of which the efforts of the fire department and many others were being directed, it is also true that until Malloy arrived on the scene the fire department had left the Etna to her fate, and were doing nothing to assist her.

Nor, I think, can it be successfully denied that, while as to the Etna herself it is extremely improbable that any actual service was ren-

dered to her by the efforts of the libelants, as to the cargo but for the efforts of libelants considerable loss would have been sustained.

We have then a case brought, except for the question of the fire department, strictly within the rule of salvage, to wit, "compensation earned by persons who voluntarily assist in saving a ship or cargo from maritime peril" or, as it is otherwise stated, "The relief of property, from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligations to render assistance, and the consequent ultimate safety of the property" (Hennessey v. Versailles, Fed. Cas. No. 6365); or, as stated in 2 Parsons, Maritime Law, 599, "Salvage service must be performed by persons not bound by mere legal duty to render it." See, also, The Blackwall, 10 Wall. (77 U. S.) 12, 19 L. Ed. 870.

To the contention of claimants that the libelants are necessarily prevented from recovering because they rely upon the use of the fire boat and crew, both of which were under obligations to perform the very services which they did perform, the libelants reply that while this consideration has the force of diminishing the award which they would have been entitled to had they furnished their own boat and their own crew, it does not in any manner affect the principle involved as to their personal service, or deprive them of the salvage earned thereby.

I have concluded, after careful reflection, that I should agree with libelants' contention if it were a matter of first impression, and it remains only for me to determine whether The Mary Frost Case was merely decided on its particular facts, and must be limited to them, or whether it laid down a sound general principle which should be applied here.

A brief review of the cases cited and decided with reference to firemen as salvors, and the right of tugs assisting fire departments, both before and since The Mary Frost Case, will show, I think, that that case must be limited to its facts and that it was an extreme and broad statement of the law even as to firemen.

Nor has it ever been cited or followed in any way as applied to a volunteer, nor, except in a case of the exact kind, even as to the fire department.

The same judge in The Suliote (C. C.) 5 Fed. 99, gives a construction of the case in this brief statement:

"Had the fire department in New Orleans extinguished the fire whilst the vessel was lying at the wharf, no salvage could have been claimed."

Though The Mary Frost Case did not cite them, two cases had been decided before that, one of which directly, and the other of which by implication, laid down the rule which the later cases have adopted, and in the light of which I am of the opinion that the action of Justice Bradley in refusing to award salvage to the volunteer citizens cannot furnish a precedent for me here.

The first case is The Huntsville, Fed. Cas. No. 6916, decided in 1860, in which a well-considered opinion by Justice Magrath, citing many cases, declares that under the circumstances of that case, though the fire department of the city was claiming salvage, they had done work

in excess of the actual requirements thereof, the vessel not being at the wharf when she took fire, and being brought into the city and saved by the fire department under a direct agreement with the city.

In The Blackwall, 10 Wall. (77 U. S.) 1, 19 L. Ed. 870, the Supreme Court of the United States allowed a steam tug Goliah, which had co-operated with the fire department, a salvage award against the contention that the libelants had no just claim to compensation, as the salvage service was performed by members of the fire department. The court in discussing this contention said:

"Service undoubtedly was performed by the members of the fire department; but it is a mistake to suppose that service was not also performed by the steam tug, as it is clear that without the aid of the steam tug and the services of her master and crew the members of the fire department would never have been able to reach the ship with their engines and necessary apparatus. * * *

"Salvors are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libelants by giving them any claim to a larger compensation, as the non-prosecution by one set of salvors inures, not to the libelants prosecuting the claim, but to the owners of the property saved. * * *

"Important service unquestionably was performed by the members of the fire department, but as they are not parties to this suit, it is not necessary to determine whether they would, under the circumstances of this case, be entitled to a salvage award. Pilots, under some circumstances, may become salvors, and cases may be imagined where firemen perhaps might come within the same rule, but the question not being before the court no opinion is expressed."

Subsequent to these cases came the case of The Mary Frost and The Suliote, both decided by Justice Bradley on circuit at New Orleans. In neither of these cases was The Blackwall or The Huntsville referred to.

In The European (D. C.) 44 Fed. 484, decided in 1890 in the Southern District of Florida, by Justice Locke, where a steam tug with a cargo of cotton on fire came into port, and the fire department, consisting of volunteer fire companies receiving no compensation from the city, were called upon and made an agreement to be paid for their services, held, that their agreement was valid, and they should be allowed salvage on account of it. The court said:

"The ship defends against the claim on the ground of the duty which the libelant owes the firemen.

"The question of the relation of firemen to property in jeopardy * * * on board vessels is not free from difficulty."

Then, after discussing The Mary Frost and The Suliote, the judge declares that those cases must be construed as authority for the proposition only that firemen are denied the right of recovery where the circumstances of the case brings it directly within the positive duty of the firemen to extinguish the fire, and then, after discussing The Blackwall and The Huntsville, reaches the conclusion which he states as follows:

"These cases satisfy me that it has not been established as is contended here, as a principle of law, that under no circumstances can firemen earn

salvage, buf'that the question depends entirely upon the circumstances of the individual case.

"Not every one is bound to render gratuitous service, even if it is his duty to do what is in his power to save life and property from marine disaster."

And as emphasizing the correctness of this view, this same Judge Locke, while sitting in the Circuit Court of Appeals in 1893, in the case of Firemen's Charitable Association v. Ross, 60 Fed. 457, 9 C. C. A. 70, wrote the opinion which must be taken as the law of this circuit.

In this opinion The European was approved, as was also The Huntsville, and though the Firemen's Charitable Association was denied salvage, it was upon the ground that it was the duty of the Association, under an express contract, to fight such fires as this, and therefore it came plainly within the principle laid down in The Mary Frost and The Suliote.

It thus appears plain that The Mary Frost, as construed and interpreted in the light of the controlling authorities, cannot serve to deprive the salvors other than members of the fire department of recovery, because these persons were under no obligation whatever to do any of the things which they did do. It remains only to determine what the salvors should.be allowed.

Upon the principle established in The Blackwall Case and heretofore applied in this district by me in other cases, the award to which these salvors are entitled should be arrived at and estimated on what the total award should be in case the service had been rendered by persons and tugs qualified to claim salvage, and then by elimination the amount to be apportioned to the ones entitled to it should be arrived at.

As I have before stated, I am of the opinion that the proof does not establish that any very substantial benefit was conferred upon the vessel, but while the testimony does not support the theory of substantial benefit to the cargo, it does establish some danger incurred in the service, but not a condition which would make the service rendered of a very high order.

I am of the opinion that for the entire salvage service there should be awarded a sum not in excess of $10,000, and that this should be apportioned two-thirds to the vessel, and one-third to the men aboard.

There were aboard the vessel, including firemen, the militia men, and the four libelants, roughly 15 or 16 men, and of these only four claim salvage.

I think there should be therefore another division, roughly, of three-fourths to the ones ineligible, leaving one-fourth for those entitled, or, in more exact figures, $800 for division, or a final award to the libelants of $800, and the decree should direct the division of this award as follows:

One hundred dollars to Sterling, $200 to Butterowe, $150 to Kuchtaruk, and $350 to Malloy, the costs adjudged against the cargo.

Let a decree be entered accordingly.